## SOUTHERN RY. CO. v. WOODSTOCK MILLS.

### 6 Div. 621.

Supreme Court of Alabama.

March 28, 1935.

Rehearing Denied June 6, 1935.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

Coleman, Spain, Stewart & Davies and J. S. Mead, all of Birmingham, for appellee.

BROWN, Justice.

This is an action of trover brought by the appellee, Woodstock Mills, a corporation, against the appellant, Southern Railway Company, claiming damages for the alleged conversion of personal property of the plaintiff.

The complaint consists of seven counts. In counts 1 and 2 the property alleged to have been converted is described as "Two (2) carloads of machinery, shipped from Pelham, Georgia, on the 7th day of April, 1933, by V. T. McKee to J. S. McKee at Anniston, Alabama." In count 5 the property is described as "a quantity of cotton mill machinery, including steam engines and the like." The other counts described the property as "Two (2) carloads of scrap iron and steel."

The defendant pleaded the general issue, with leave, etc.

The effect of the general issue in the action of trover imposed on the plaintiff the burden of showing that it had title, general or special, in the property; had possession or the right to immediate possession at the time of the alleged conversion. Stanley v. People's Sav. Bank, 229 Ala. 446, 157 So. 844. It also imposed on the plaintiff the burden of showing that the defendant wrongfully destroyed plaintiff's right and title, or unlawfully interfered with his use, enjoyment, or dominion over it, or appropriated it to defendant's use or to the use of another in disregard or defiance of the owner's right. Bolling v. Kirby & Brother, 90 Ala. 215, 7 So. 914, 24 Am. St. Rep. 789. And the defendant may show justification under the plea of the general issue. Barrett v. City of Mobile et al., 129 Ala. 179, 30 So. 36, 87 Am. St. Rep. 54.

The evidence is without dispute that the property involved consisted of two units of used electrical machinery, purchased by the plaintiff, acting through its president, Dudley D. Campbell, and its vice president, V. T. McKee, at Pelham, Ga., for the primary purpose of dismantling the same and shipping it to Anniston, Ala., and there rebuilding and installing it as a power plant. Some of the minor parts of the machines had been removed, and all of it had been considerably used as a power plant, but had been in disuse for a number of years. The two units were dismantled, so far as necessary, for shipment, and the parts loaded on railroad cars by the plaintiff's engineer at Pelham, Ga. V. T.

McKee then procured from the railroad agent at Pelham two bills of lading, one for each car loaded, consigning the shipments to J. S. McKee, Anniston, Ala.

J. S. McKee was not an officer or agent of the plaintiff and in no way concerned in its business, but was a brother of V. T. McKee.

The shipments were consigned to J. S. McKee to conceal plaintiff's ownership of the property, and the fact that it purposed to install the same in its plant to generate power for use in the operation of plaintiff's mills.

The property was classified on the bills of lading as "scrap iron and steel," and the bllis of lading indorsed on their face SL&C, indicating the shipper's load and count. The freight was computed on the classification embodied in the bills of lading, and on one carload $84.25, and on the other $85.26, were prepaid as freight to the railroad agent at Pelham, Ga.

After the two cars arrived in Anniston, about midday on Monday, April 10, 1933, said V. T. McKee called the office of the defendant's yardmaster and talked to a clerk in the yardmaster's office, requesting that the cars be switched onto the loading tracks on the property of the Woodstock Mills. They were so placed between 2:30 a. m. and 3 o'clock p. m. April 10, 1933; one car inside the gate and the other left standing in the gateway. The "master mechanic" then told V. T. McKee that the cars had been placed as requested, and McKee went down and looked at them. The switch engine at that time had been cut loose and moved away.

H. H. Witt, the defendant's agent at Anniston, testified: ."The first I knew of it was when the cars were received there on Sunday, the 8th of April. They arrived consigned to Mr. McKee, who we didn't know and the cars were placed on what we call our team track or hold track. Our yardmaster called my office on Monday morning and stated that Mr. McKee had called him and asked him that those cars be placed on the Woodstock Cotton Mill siding for unloading and wanted to know if it was all right to place them, and I authorized him to place them at that point for unloading. I inspected the cars Monday morning about ten o'clock, on the track of the Woodstock Mills. At the time I inspected them, I didn't talk to anybody except some workmen who were preparing a place to unload the machinery and set it up. I had no conversation with Mr. McKee at that time. I then returned to my office and ascertained the correct rate on secondhand machinery and called up Mr. McKee over the telephone and

told him that I had inspected the cars and found that they were secondhand machinery instead of scrap iron and there would be additional charges on the shipments and that he would have to pay those charges before he unloaded them, and he asked me to come down to see him and discuss the matter with him, and I immediately went down to his office and we went out to the cars and inspected the cars and I stood there and talked with him for nearly an hour explaining to him why we couldn't apply the scrap iron rate to the shipments, and he argued that since he had bought the shipments as scrap iron at scrap iron rates that we couldn't apply the machinery rates to the shipments, and I told him in my opinion we couldn't apply the scrap iron rates, but if he contended that the scrap iron rates should apply I told him I would be glad to notify the Southern Weighing & Inspection Bureau and let them send an inspector over there to pass judgment as to the correct classification on the shipments. That conversation was about 11:00 a. m., on Tuesday, the 11th of April. At that time nothing had been removed from the cars at all and I asked Mr. McKee if he would instruct his men not to unload any part of the freight at all until he had paid the additional charges and he said he wouldn't unload any part of it at all, and then we talked on and discussed the matter another 30 or 40 minutes, and then I asked him the same question again, and I told him I would have to pull the cars out unless he did agree to pay the additional charges, and he said well, that wouldn't be necessary, that he wouldn't unload any of them, that he would just let them stay where they were. The next time I saw those cars was that afternoon as I started home, about five o'clock, I went by the Woodstock Cotton Mill for the purpose of seeing whether or not any of the freight had been unloaded and they were unloading some of the machinery at that time. I went on home and called the Woodstock Cotton Mills and asked for Mr. McKee and he was out and I talked to Mr. Campbell and told him that Mr. McKee had promised not to unload any of the material and that they were unloading it and that I would have to pull the cars out unless he stopped unloading it, and Mr. Campbell stated that he didn't intend to stop unloading it but was going to continue to unload it, and I then called our yard and instructed them to pull the cars out. When I got down to the office the next morning around eight o'clock I found the cars had not been switched out of the plant and I got on the switch engine myself and went down there and had the cars pulled out. The cars were pulled out on Wednesday morning, April 12th, about 8:30. Some of the shipment had been removed from the cars when they were pulled out. Some three or four thousand pounds had been taken off of the flat car."

This testimony was not controverted.

The witness Campbell, president of the plaintiff corporation, testified: "The first day that the cars were delivered was on Monday. The second day that the cars were delivered, Tuesday, in the afternoon about half past four, Mr. Witt called me on the telephone and told me that he understood that we were unloading the freight and that we couldn't do that, that we would first have to pay him $300.00 additional. I told him then we were unloading and we couldn't stop; we had a crew at work and that the property was ours and we couldn't stop the unloading process. Mr. Witt said: 'Well, I will have to stop you. I will just send around and pull the cars.' I said: 'Don't do that because we can't let you have the cars,' and he said: 'Well, we will see about that.' I believe Mr. Witt is the freight agent of the Southern Railway. I had no other conversation with Mr. Witt on that occasion and the conversation that I did have was over the telephone."

Campbell further testified that he called a Mr. Cook, who was shown to be a freight soliciting agent for the railway company, and "I told him of the conversation with Mr. Witt and told him that I felt that we were being imposed upon and I wanted to know if he couldn't immediately take up with some other source the question of our position in the matter, as we had been told by Mr. Witt that he was going to pull those cars, and I wanted him to intercede and see that the cars were left where they were. He said it was too late to take it up with Atlanta then but the first thing in the morning he would take it up and let me hear from him; but before I heard from him on the morning following, on Wednesday, they came out and pulled those cars out of there." Also, "We bought this machinery to try to rebuild and to make it of use if we could do so. That was one of the purposes. If we couldn't rebuild it, we were then to deliver it to the Emory Foundry and they were to melt it up and repay in part or in total the sum of money that we borrowed from Mr. Wilson, who owned the plant."

It further appears without dispute in the evidence that the classification of freight rates approved by the Interstate Commerce Commission is as follows: "That rate of $3.25 per ton of 2,000 pounds on scrap iron and steel is published in Agent F. L. Speiden's

Freight Tariff No. 243, I. C. C. No. 1602 (Item No. 200), and according to its terms is applicable on 'Iron or steel, scrap or pieces, not copper clad (see Note 1) borings, filings or turnings, not granulated, ground nor powdered, in straight or mixed carloads (not subject to Rule 24 of Southern Classification) carload minimum weight 50,000 pounds.' Note 1 reads: *'Rates apply only on scraps or pieces of iron or steel having value for remelting purposes only.'* " (Italics supplied.)

The evidence further shows that the freight paid on one of the carloads, computed on this classification, was short $16.25. Computed on classification as secondhand machinery, the freight prepaid on one car was short $163.07 of the lawful rate, and on the other $130.64, aside from demurrage charges.

There was an absence of evidence going to show that the consignee, J. S. McKee, made any request for placing the cars, or that the bills of lading were surrendered to the carrier or its agent.

At the conclusion of the evidence the defendant requested the affirmative charge in writing, directing a verdict in its favor, which was refused by the court.

The appellant contends, first, that the evidence shows without dispute that these shipments were improperly classified as "scrap iron and steel," and that the carrier had a lien on the property for the freight computed on a correct classification, and the only classification applicable was machinery; and, second, that, in placing the two cars under the circumstances, the carrier did not lose dominion over the freight or waive its lien thereon.

The appellee, on the other hand, contends, under the evidence, these were questions for the jury, and therefore the affirmative charge was properly refused.

We are clear to the conclusion, after careful consideration of the evidence, the substance of which we have stated, that the property involved was not subject to classification as scrap iron and steel, that is, it was not "scraps or pieces of iron or steel having value for remelting purposes only," and that the rate applied, on shipper's load and count, at Pelham, Ga., was not the lawful rate, and that the carrier, when the shipment arrived at its destination, was entitled to reclassify the shipment and demand the lawful rate.

The effect of the decisions of this court, followed and approved by the Supreme Court of the United States, is that a shipper who has obtained from a common carrier transportation of goods from one state to another at a rate specified in the bill of lading less than the lawful rate, on an erroneous or incorrect classification, whether or not he knew the rate was less than the schedule rate, is not entitled to the possession of the goods without payment or due tender of the lawful rate, and the carrier's lien on the goods, by force of the act of Congress, for the amount fixed by the schedule rate and charges, attaches when the goods come into the possession of the carrier. Southern Railway Company v. Harrison, 119 Ala. 539, 24 So. 552, 43 L. R. A. 385, 72 Am. St. Rep. 936; Texas & Pacific Railway Co. v. Mugg & Dryden, 202 U. S. 242, 26 S. Ct. 628, 50 L. Ed. 1011; Northern Alabama Ry. Co. v. Phillips, 220 Ala. 541, 126 So. 846.

We are also of opinion that in the circumstances disclosed by the evidence the carrier did not waive the lien by the act of placing the cars on the loading tracks located on plaintiff's property at the request of V. T. McKee. He was not the consignee, and prima facie had no right to request that the cars be so placed, and receive delivery without first presenting to the carrier the bills of lading duly indorsed, or disclosing to the carrier's agent that the property belonged to the plaintiff. The admitted purpose of the use of J. S. McKee's name as consignee was to conceal the fact that the plaintiff was the owner of the property, and there is an absence of evidence showing or tending to show that the carrier's agents and employees in placing the cars intended a delivery to either V. T. McKee or the plaintiff. The evidence does not show a previous course of dealings with the consignee, J. S. McKee; in fact, shows without dispute he was unknown to the defendant's agent, and it would be the barest conjecture to conclude, in these circumstances, that the defendant's agents and servants intended to deliver the cars to the plaintiff in the absence of a surrender of the bills of lading duly indorsed to it. See 4 R. C. L. 824, § 279; Rothchild Brothers v. Northern Pacific Railway Company, 68 Wash. 527, 123 P. 1011, 40 L. R. A. (N. S.) 773, and note.

Where, as here, the only basis for a verdict in favor of plaintiff must rest upon speculation pure and simple, a choice merely of conjectures, it is not sufficient to justify the refusal of the affirmative charge to the defendant. St. Louis & S. F. R. Co. v. Dorman, 205 Ala. 609, 89 So. 70.

There is no controversy between the parties here in respect to the defendant's acts in advertising and disposing of the property.

The judgment here is that the court erred in refusing the affirmative charge requested by the defendant.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.

#### On Rehearing.

BROWN, Justice.

Appellee's counsel seem to be amazed by the holding of the court that the two units of electrical machinery consisting of an electrical generator, the major elements of which consist of quantities of copper wire, and a steam engine equipped with brasses and an electrical switchboard, are not "scrap iron or steel"; that is, "pieces of iron or steel having value for remelting purposes only," and strenuously insist that the jury should be allowed to determine by their verdict that said shipments consisted of only "pieces of iron or steel having value for remelting purposes," and within the classification of the rate schedule under which the shipments were made.

It may be noted that said schedule expressly excepts "copper clad" material.

Though it be conceded that the materials constituting the cargo may have been "junk" or "scraps," neither the ingenuous argument of counsel nor the verdict of the jury could convert this "copper clad," secondhand machinery into "scraps or pieces of iron or steel."

It unmistakably appears from the bill of exceptions that the bills of lading were produced in court by plaintiff's counsel during the examination of its first witness, Campbell, who was called on to identify and did identify said bills of lading. They were then, on cross-examination of the witness, offered in evidence by the defendant.

The bill of exceptions also shows that McKee, who requested that the cars be placed, was not the consignee; that the request was made, not to Witt, the agent of the company who had authority to make the delivery, but to a subordinate in the office of the yardmaster, and the excerpt quoted from witness' (Witt) testimony in the application for rehearing, "They arrived consigned to Mr. McKee—our yardmaster called my office on Monday morning and stated that Mr. McKee had called him and asked him that those cars be placed on the Woodstock Cotton Mills' siding for unloading and wanted to know if it was all right to place them, and I authorized him to place them at that point for unloading," clearly shows that Witt was acting on the assumption that the request for placing the cars was by the consignee, McKee. It was not until Witt inspected the cars after they were so placed that he ascertained the plaintiff's connection with the transaction and made demand on it for the additional freight.

In these circumstances, it is clear that the railroad agent in authorizing the cars to be placed did not intend to deliver the shipments to the plaintiff.

The application is therefore overruled.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.