10 So.2d 367

**SMITH v. ROLAND.**

4 Div. 260.

Supreme Court of Alabama.
Oct. 8, 1942.

Rehearing Denied Nov. 5, 1942.

W. G. Hardwick, of Dothan, for appellee.

W. L. Lee and Alto V. Lee, III, both of Dothan, for appellant.

BROWN, Justice.

This is an action on the case by the administratrix of Howard Roland, deceased, under the homicide act, Code 1940, T. 7, § 123, as modified by the "Guest Law," Code

1940, T. 36, § 95, against the owner of a motor vehicle on which said Roland was riding at the time of his death as a guest or invitee.

■ The case went to the jury on count 8 of the complaint as last amended and the evidence offered by the plaintiff. The defendant offered no evidence, but requested the affirmative charge in writing which was refused.

Said count eight charges "that Henry Smith at said time and place wantonly injured said plaintiff's intestate by wantonly causing said truck to collide with a truck driven by J. Williard Whiddon, and as a proximate consequence of said wanton conduct the Plaintiff avers that her intestate received injuries causing his death." The defendant pleaded the general issue.

Said intestate and Lenard Watkins were riding on the rear of the defendant's logging truck, intestate sitting near the bolster.

The evidence goes to show that while passing Whiddon's truck on the bridge or just after the defendant's truck passed off the bridge, defendant in attempting to pull his truck further to the right, caused the bolster to swing arount and strike intestate, or that the Whiddon truck as it passed came in contact with the bolster and threw it around striking intestate. Said intestate was carried to the hospital in Dothan and there died as the result of his injuries.

Said Watkins testified: "I was riding on a truck driven by Henry Smith when there was an accident. We left Dothan around 5:30 o'clock that afternoon and it was not quite dark. After leaving we went to a saw mill and stayed for a while and it did not get dark before we left the saw mill and started home. We were riding on the Dothan-Panama City highway, towards home and Howard Roland was on the truck with me. We were sitting on the back of the truck and Henry Smith and his wife were in the front. There was a bolster on the truck but I do not know how wide it was. I was not sitting on it. The bolster extended all the way across the truck and Howard Roland and I were sitting about as far from here to the Judge's desk from it, sitting on a piece of rail. When we were riding down the highway we had an accident somewhere about a bridge over Chipola Creek. It was around seven or eight miles from Dothan. I heard a noise and about that time something knocked me off the truck. I fell to the pavement and at the time I was knocked off the truck we met another truck. The truck that I was on did not come in contact with the truck that we met. I do not know what knocked me off the truck but reckon it was the bolster as there was a jolt of the truck. Just before I hit the ground there was a collision between the truck on which I was riding and the truck we met. I don't know anything about the other truck but do know that I hit the dirt. I got up and the truck stopped up the road but I do not know how far. I got back on then and I went on up to the store and called an ambulance down there and the ambulance got us and brought us back to the hospital here in Dothan.

"All I know is the truck hit the bolster and I reckon it hit Mr. Roland. The truck that we met had hit the bolster and Henry Smith was driving at the time. I think we had gotten off the bridge when it happened as that was where I was on the road.

"It was dark when the accident happened and I was on Mr. Smith's truck behind the cab. I was facing in the direction in which the truck was going and was sitting down on a little railing. The bolster was across behind me and we had just crossed the bridge down there over Chipola Creek. There are guard rails down there on the highway and I do not know whether the truck was still in those guard rails or not. We had just crossed over the bridge and the other truck was coming from the South coming up on the bridge and no part of it hit Mr. Smith's truck except the bolster. No part of the body came in contact with the truck and I was knocked off on the ground about the time it hit the corner of the bolster. The other truck kept going and did not stop. Mr. Smith stopped his truck and I got back on. Mr. Roland was not knocked off the truck and we took him on down to Rehobeth and called the ambulance. I know where Manie Powell lives and we had stopped at his house about a quarter or one-half mile from the creek before the accident. From where we stopped to where the accident happened Mr. Smith was driving about twenty-five or thirty miles an hour and was on his side of the road. The body of the other truck hit the bolster.

"* * * I can look at a speedometer and tell how fast one is running but did not see the speedometer on the truck that night. I thought it was running about twenty-five

or thirty miles an hour. The guard rails on each side of the bridge and the embankment there lead up to the bridge and I could not tell whether the truck we met was on its side of the road. I could see the line down the center of the road but was not looking at it at the time of the accident. Just a few minutes before I had been looking at it at a distance about as far as from here to the back of the room but I could not say where we were at the time of the accident. After the accident Howard Roland was riding back on the bolster with his head and shoulders against it. Before the accident he was sitting up holding to the back of the cab."

The witness Sellers who was on Whiddon's truck testified:

" * * * On December 9, 1939, I was on a truck that came through Houston County and was involved in an accident at Chipola Creek. We were traveling North coming towards Dothan and Williard Whiddon was driving the truck that I was on. I was on the trailer and was looking towards the front. At the time we got to the bridge at Chipola Creek I saw a truck coming. The truck was in the curve North of the bridge and the curve is what I would call a common curve. It is not so awfully short. It came around on our side of the road when I first saw it something like fifty yards away. It was traveling thirty-five or forty miles an hour and we were on our side of the highway. As it came around the curve, in my judgment, it increased its speed, reaching perhaps forty or forty-five miles an hour. As it approached us it seemed like the driver of the truck put in to pull it back on his side of the road and that did switch around that bolster. The bolster hit the corner of our body and it did not seem like it jarred our truck very much. At the time of the collision we were on our side of the highway, just as far over to the right as we could get without running into them. Our truck had just about cleared the bridge at the time of the accident and the other truck was travelling forty to forty-five miles an hour at that time. I do not know whether the highway runs directly North or South at that point and in my judgment the truck that we met at the time of the impact was to the East of the center line of the highway. After the impact, I watched the other truck as it went over the hill. It went out of sight and got faster, it looked like.

We didn't stop but we came mighty near stopping.

"The truck that I was travelling on was going about fifteen or twenty miles an hour at the time the accident happened. It did not stop right then but did stop before we got out of sight. We stayed there only long enough to say 'did I reckon we should go back'. After that we went right on away and Mr. Whiddon was arrested the next day at Newville.

      *      *      *      *      *

"When the truck that we were meeting came around the curve it was on our side of the road and the driver started pulling back on his side of the road. It seemed like the back end of the truck skidded around and I saw it when it passed. I do not know where the rear dual wheels are on the truck or where the bolster was. I did not testify that I saw the body of the truck hit the . bolster on Henry Smith's truck and do not know what party [part] it hit. I don't reckon it hit the rear dual wheels and don't know very much about how it happened as it was just like popping your finger. There were good lights, in my judgment on Williard Whiddon's truck at the time of the accident and they were burning and shining down the road. It was good dark at the time of the accident."

The witness Mrs. Sellers testified:

" * * * I was riding in a truck with J. Williard Whiddon and my husband, coming in the direction of Dothan, when we met a truck. I don't know whether it was a lumber truck or not but it looked like it had bolsters on it or something. I could see well enough to see it was that, and there was a curve in the road and we were on our side of the road just as far as we could get without being off the pavement. Something struck but I do not know what it was. It went kinda like a pistol shot and it did not jar our truck. It happened at the same time the truck we met on the bridge was passing us. I do not know whether it happened at the same time the body of our truck passed where the bolster was but it was somewhere about that time. I imagine the truck on which I was riding was traveling about twenty miles an hour and I couldn't see very much of the truck that passed us, after it had passed by. I kinda looked back and the truck we were riding on almost stopped but we didn't stop as the other truck got faster instead of stopping.

"We stopped in sight of the accident but Mr. Whiddon did not go back down there. After that we went right on through Dothan to Newville. The truck or Henry Smith did not stop at that time. The accident took place right at the bridge but Mr. Smith's truck did not stop as close as 20 yards to the bridge. I do not know how far it went before it stopped as it was going over the hill. When we got on the curve a little bit we stopped. Mr. Whiddon was traveling real slow and almost stopped but after he found out the other truck did not stop we went on.

"I don't know whether we could see the bridge from the point we stopped as it was dark and I couldn't tell. This was the first time I have ever been along that road and we all looked back after the accident. We stopped when we got up there a little piece further and in my judgment it was about seven o'clock."

The bridge was at the middle of the south part of an S curve.

This evidence at best shows simple negligence. It does not warrant an inference of wanton conduct.

The court therefore erred in refusing the affirmative charge. Code 1940, T. 36, § 95; Chapman v. Nelson, 241 Ala. 21, 200 So. 763.

██ "Gross negligence" is negligence, not wantonness.

██ "Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, that with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury. * * *." 5 Mayfield's Digest, p. 711, § 6.

Reversed and remanded.

GARDNER, C. J., and THOMAS and LIVINGSTON, JJ., concur.

On Rehearing.

BROWN, Justice.

In Birmingham Railway & Electric Co. v. Pinckard, 124 Ala. 372, 26 So. 880 [cited by appellee in brief on rehearing], there was evidence tending to show, "that at the place of the collision the avenue for the use of vehicles was very narrow, not affording sufficient room for the passage of two vehicles without throwing one within a few inches of defendant's tracks, and that at this point the driver of plaintiff's buggy was forced up against or near defendant's tracks by a passing carriage or barouche; that at this place the defendant operated a double line of tracks, and a passing car on the south tracks, going in an opposite direction, frightened plaintiff's horse, which, to a degree rendered him unmanageable; that, while the driver was endeavoring to pull the horse from the tracks, a car approaching from the rear on the north line of tracks next to the traveled part of said avenue, and at the rate of speed above mentioned [15 to 20 miles per hour], was about a block or a block and a half away with nothing to obstruct the view; that the woman, Mary Jeter [who was in the buggy], hallowed to the motorman of the approaching car, and made signs to him by throwing up her hands, but that no effort was made by the motorman to stop or reduce the speed of the car until after the collision which resulted in the injury complained of." 124 Ala. 374, 26 So. 881. [Brackets supplied.]

This evidence warranted an inference that the motorman driving the street car had knowledge of the impending peril of the property injured or destroyed by the collision in time to have avoided the collision, supplying the element of knowledge essential to wantonness and for that matter willfulness. Central of Georgia R. Co. v. Corbitt, 218 Ala. 410, 118 So. 755.

In the instant case there is an absence of evidence showing that Smith had knowledge that plaintiff's intestate had placed himself within the range of the bolster which flew around or was knocked around and injured him; that his (Smith's) effort to right the truck and bring it to the right lane of the highway would cause the bolster to change its position, or that it extended over the side of the truck and would probably come in contact with the passing vehicle. These essential elements of wantonness were at best left to conjection pure and simple. Southern Ry. Co. v. Woodstock Mills, 230 Ala. 494, 161 So. 519.

Application for rehearing is overruled.

GARDNER, C. J., and THOMAS and LIVINGSTON, JJ., concur.