SAM A. BEATTY, Retired Justice.
The defendants Jeff Henry Vaughn and Henry Homes, Inc., appeal from judgments in favor of Richard Butler and his wife Kathy Butler, and Sean Lovelace and his wife Phyllis Lovelace, in the actions against the defendants brought by the Butlers and the Love-laces. Each action alleged negligence, wanton conduct, and breach of an implied warranty in the sale of a residential house. This case is before this court pursuant to § 12—2—7(6), Ala.Code 1975.
The Butlers purchased a new residence on Lot 11 of Camelot West Additions, Unit Four, on March 28, 1990; the Lovelaces bought a new residence on an adjoining lot, Lot 12, on July 10,1990. The defendant Jeff Henry Vaughn had developed this subdivision in 1979 and had sold it in 1980 to the defendant Henry Homes, Inc., of which he was president. In that capacity Vaughn had supervised construction of houses on the lots and had negotiated the sales to these two sets of plaintiffs.
Each of these residences was serviced by a septic tank system, and notice that these systems were malfunctioning was first given to Vaughn and Henry Homes during January 1991. Ultimately, these actions were filed against Vaughn, Henry Homes, and others. The two cases were tried together, and both were submitted to a jury on the claims of negligence and wanton conduct against Vaughn, Henry Homes, and Murrill Tank Service and George Murrill, the septic tank installers. The implied warranty claim was submitted to the jury only as to Henry Homes. The jury awarded the Butlers $25,-000 in compensatory damages and $5,000 in punitive damages against Vaughn and Henry Homes; it returned an identical verdict for the Lovelaces. The jury found in favor of Murrill and Murrill Tank Service. The court entered judgment on the verdicts. These appeals followed.
There is substantial disagreement among the parties on the issues presented for review. Our search of the record, including the defendants’ motions for a directed verdict *227 and then for a new trial, see King Mines Resort, Inc. v. Malachi Mining & Minerals, Inc., 518 So.2d 714, 716—17 (AIa.1987), forces us to conclude that the sole issue preserved for our review is whether there was sufficient evidence to support the jury’s verdicts finding wanton conduct. Indeed, all parties concede that this is the principal issue.
The septic tank systems serving each residential lot in question presented no operational problems until January 1991. During that month the Butlers’ system backed up. Their backyard became wet with sewage; the sewage caused a foul odor. Thereafter, sewage flooded into then- home on several occasions. Problems continued until the time of trial. A field line burst, and afterwards, when the Butlers operated their toilet or shower, one could observe a discharge of excrement from the ground in the backyard. The Lovelaces had similar problems, with overflowing bathrooms and sewage flooding their home.
Both families put Vaughn and Henry Homes on notice of their problems and also notified the Mobile County Health Department (“the Health Department”). The Health Department inspected the properties, and then sent notices to each family advising them that the unsanitary conditions violated the rules and regulations promulgated by the Board of Health of the State of Alabama governing septic systems (“the state rules and regulations”). See Rules of the State Board of Health regarding onsite sewage disposal and subdivision onsite sewage systems, Chapter 420—3—1, Ala.Admin.Code; State Board of Health regulations governing onsite sewage disposal systems, §§ 2—150, 161—62; and State Board of Health regulations governing subdivision development, §§ 2—223—224.
When Vaughn obtained the land which became Camelot West Additions, he submitted to the Health Department a plan for a residential subdivision on that land, requesting approval for the use of septic tank systems. Thirteen of the lots in Units Three and Four, including Lots 11 and 12 of Unit Four, were “deleted”[1] because they could not be used for such a system without certain changes to bring them into compliance with the state rules and regulations. These changes involved additional filling and grading. Vaughn and Henry Homes added fill to Lots 11 and 12 over a period of 10 years.
Vaughn, acting for Henry Homes, engaged Larry Crawley of Pioneer Plumbing Company to conduct percolation tests and to design proposed septic tank systems for Lots 11 and 12. The actual designs for the two systems were done by Larry Crawley’s father, Delaney Crawley, a licensed professional engineer who was at the time a consulting engineer with his son Larry’s plumbing company. In March 1989, Delaney Crawley submitted his designs to the Health Department for its approval. The Health Department approved the designs on April 13, 1989, and Henry Homes completed construction on Lots 11 and 12 around September 27, 1989. Murrill Tank Service installed the septic tank system on Lot 11, and the Health Department issued a permit for its use on August 10,1989. The Butlers took possession of Lot 11 on March 28, 1990. Murrill Tank Service also installed the septic tank system on Lot 12, and the Health Department issued a permit for its use on June 14, 1989. The Lovelaces took possession of Lot 12 on July 10, 1990.
Under the state rules and regulations, it was incumbent upon the builder that the system, an “alternative” one, would be installed and that the completed installation would be certified by an engineer. Vaughn signed “form letters” of assurance, but, he maintained, they were in blank when he signed them. Vaughn gave them to Larry Crawley and, after their completion, they were ultimately delivered to the Health Department.
When Vaughn developed the subdivision, he established restrictive covenants requiring that houses be built 25 feet or more from the *228 front property lines. Vaughn’s plans for the houses on Lot 11 and Lot 12 conformed to this requirement, with the septic tanks to be located immediately behind the houses. When Delaney Crawley measured the 25 feet required for the minimum setback, however, he measured from the curb of the street in front of the lots, not from the property lines. That meant that when the houses were built 25 feet from the front property lines, they were located over the area Crawley had used as the planned locations for the septic tanks. L.K. Cochran, the senior environmentalist with the Health Department at the time, was the official who reviewed the engineer’s proposal for the septic systems, inspected the premises, and approved the engineer’s plan. He inspected the premises of both lots after the problems arose, and in doing so, discovered that both houses were set further back than the house sites he had approved; in fact, he discovered the houses were built over the area where the percolation tests and soil borings had been made. Delaney Crawley testified at trial that he had been told by Vaughn that the property line and the curb were the same. Of course, Vaughn and Henry Homes could not build these houses according to Crawley’s design without breaching the setback covenant, and Murrill, the septic tank installer with whom Henry Homes had contracted, could not place the septic systems where Crawley had intended them to be located, because those areas were covered by the houses.
Murrill, the operator of Murrill Tank Service and the installer of the two septic systems, had obtained the Health Department permits to install the systems. When he went to the jobs, the houses had been built and the ground had been prepared for the tanks. Although he did not see the plans and specifications for the sewage disposal systems, he installed the systems and signed a certification that they had been installed in accord with the Health Department permits. When he set the tanks, however, there was ground water filtering into the tank holes.
Bennie Howell was the Health Department inspector responsible for “as built” inspections. He inspected and approved the installations after Murrill had first installed the systems. Howell described them as “controlled fill” systems, i.e., those systems installed upon sloping ground. He examined the ditches and the depth of the gravel. The field lines were running with the contours of the ground as the ground sloped down toward a creek at the rear of the houses. When he inspected, he said, there was no water in the trenches. When the Lovelaces began to have problems, Howell met Murrill at that lot and together they determined that water was getting to the field lines and was backing into the septic tank. He determined that the ground was not absorbing the water fast enough.
When Howell inspected the Butlers’ lot in August 1989, he found that Murrill had lowered the third field line about eight inches, that is, had made a “step down” or serial distribution. The state rules and regulations sanctioned such a procedure, and Howell approved it. It was his opinion that the systems on the lots were workable as installed, but that during wet weather the ground water elevation caused the problems.
Charles Shirk, a public health engineer with the Health Department, supervised the Land Resource Development Division. In January 1991, he visited Lots 11 and 12 with Murrill, Vaughn, and John Williamson, an administrator with the Health Department, in connection with the complaints. They dug holes on the property, read elevations, and measured water tables. All of the holes were proximate to the field lines and had water in them, indicating that all the fines were receiving effluent from the septic tanks. Shirk was also there in February, and he visited the lots again in early June with Murrill, Vaughn, and Williamson. On June 10 and 11, 1991, Shirk joined a Mr. Erdman, Williamson, Les Prescott from the federal Department of Housing & Urban Development (HUD), Murrill, Vaughn, and the Butlers and the Lovelaces at the lots. All were engaged in collecting data, digging holes, and reading and recording elevations. This visit resulted in Prescott’s making recommendations that recognized a seasonal water table problem, specifically the problem that the elevation level of the ground water varied throughout the year. During the wet season,
*229 December through April, and in periods of heavy rain, the water table rose to the point where, according to Shirk, it contributed water “to at least the system on Lot 11 and possibly the system on Lot 12.” Prescott’s recommendation also addressed the quality of fill material on the lots; the fill material presented problems which he stated could be fixed.
Williamson accompanied Murrill out to Lots 11 and 12 in the summer of 1991. Mur-rill had contacted Williamson, told him he had a permit, and expressed the desire to implement a repair plan with an inspector present. This plan, designed by Delaney Crawley, called for extending the field lines. After Murrill’s equipment had been digging for a few minutes, he says, he called Williamson over to the repair area, where both of them observed an underground spring flowing freely into the area where the field lines were to be extended. Within a few minutes, the spring had filled the repair area. Both Williamson and Murrill realized that Craw-ley’s plan would not work. Prescott subsequently performed some tests, with Williamson present. Later, Murrill telephoned Williamson and told him that he, Murrill, was ready to fix the systems and would “do whatever it takes.” Murrill indicated that he “was ready to do it himself.” Murrill had his equipment on the scene, and waited to begin on the Butler lot first. According to Williamson, Mrs. Butler came to the door and told him and Murrill, “[B]efore you come on the property, I need to make a phone call to my attorney.” Williamson stated that Mrs. Butler came back later and said, “I’m sorry, you can’t come on the property.”
Mrs. Butler herself had a conversation with Vaughn about her problem. She stated that Vaughn told her to contact Murrill, and that Vaughn said they “were probably using the commodes [and the washing machine] too much.” Mrs. Lovelace also had a conversation with Vaughn, and said, “[H]e told me that we had too [much] water consumption.” Mrs. Lovelace also stated that Vaughn told her “he would send his septic tank man out.” Murrill was there the next day, accompanied by Howell.
The record clearly establishes that Vaughn and Henry Homes, acting through Vaughn, attempted to conform the septic tank systems in question to the state rules and regulations when Vaughn sought approval for the lots. Thereafter, they employed others, i.e., Crawley and Murrill, to design and install the systems. Later, when the error in the location of the houses was discovered, Vaughn sought the assistance of numerous others knowledgeable on the subject, over a period of time, to find a solution to the problem. Was his conduct wanton?
In Lynn Strickland Sales & Service, Inc. v. Aero—Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987), our supreme court discussed wanton conduct:
“Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury. The element of intent, or knowledge, is not present in simple negligence, and the element of intent does not raise a person’s conduct to merely a greater degree of negligence as, for instance, gross negligence. As the Court stated in Smith v. Roland, 243 Ala. 400, 403, 10 So.2d 367, 369 (1942), quoting 5 Mayfield’s Digest, p. 711, § 6:
“‘“Gross negligence” is negligence, not wantonness. Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, that with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury.’ ”
The record affirmatively shows that Vaughn worked to have the subject lots conform to the state rules and regulations, and after receiving approval, acted reasonably to have the septic systems designed and installed by experienced persons. Moreover, he was instrumental in seeking assistance from experienced persons in regard to corrective measures. The fact that nature combined with the mistakes of others to thwart the remedial measures does not suggest a con *230 scious and intentional purpose to inflict harm. The facts do not show by clear and convincing evidence that Vaughn knew that his conduct would likely or probably result in injury to the Butlers or the Lovelaces, that he consciously did any act that harmed them, or that he harmed them by any conscious omission of duty. § 6—11—20, Ala.Code 1975. See also Big B, Inc. v. Cottingham, 634 So.2d 999, 1002 n. 1 (Ala.1993) (the standard for reviewing the sufficiency of the evidence on a punitive damages claim is the clear and convincing evidence[2] standard). Hence, the trial court erred in denying the defendants’ motion for a JNOV in regard to punitive damages.
That portion of each judgment awarding $25,000 compensatory damages is due to be affirmed. Therefore, the judgments are affirmed, conditioned upon the plaintiffs’ acceptance of a $5,000 remittitur of the punitive damages award in each case. If the plaintiffs in either case do not, within 30 days after the date of this opinion, file a remittitur reducing their award to $25,000, the judgment in their case shall be reversed and the cause remanded for a new trial. See § 12—22—71, Ala.Code 1975.
The foregoing opinion was prepared by SAM A. BEATTY, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of § 12—18—10(e), Ala.Code 1975, and this opinion is hereby adopted as that of the court.
AFFIRMED CONDITIONALLY.
All the Judges concur.

. L.K. Cochran, an employee of the Health Department who testified in this case, explained that lots in a subdivision that do not comply with the state rules and regulations may be either rejected as unsuitable for development or "deleted.” A deleted lot may be resubmitted for approval at a later time after the developer has made the changes necessary to bring the lot into compliance with the state rules and regulations.

. "Clear and convincing evidence" is defined as "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.” § 6-11-20(b)(4), Ala.Code 1975.