HORNSBY, Chief Justice.
This is a medical malpractice ease. Because the complaint was filed before June 11, 1987, the Alabama Medical- Liability Act of 1987, Ala.Code 1975, § 6-5-540 et seq., is not applicable to this action. Section 6-5-552. Thus, the “similarly situated health care providers” standard mandated by § 6-5-548 does not apply. Further, the law of this case includes the “scintilla” rule of evidence, because the Act’s “substantial evidence” standard provided for in § 6-5-549 is also inapplicable.
On February 2, 1987, Faith Reagan Bush (“Reagan”), through her father, William Bush, brought claims alleging medical malpractice against The Children’s Hospital of Alabama (“Children’s Hospital”), The University of Alabama Health Services Foundation, P.C. (“the Foundation”), Dr. Rutherford Polhill, Dr. David Reynolds, and Dr. Mark Didea, relating to the diagnosis and treatment of the Hemophilus influenza meningitis she contracted in April 1982'. The claims against Drs. Polhill and Reynolds were dismissed, and the jury found in favor of Children’s Hospital and Dr. Didea. However, the jury returned a verdict against the Foundation in the amount of $1,500,000. The Foundation appeals from a judgment based on that verdict.
I. Facts
Reagan was born on January 81, 1979, with severe birth defects relating to the formation of her brain and spinal canal. These abnormalities included spina bifida with mye-lomeningocele, a defect in the lumbar portion of the spinal canal causing her spinal cord to protrude through the skin of her lower back and causing her to be paralyzed from the waist down; Arnold-Chiari malformation, a condition wherein the medulla portion of her brain protruded down into her upper spinal *796 canal; and hydrocephalus, a condition in which excessive cerebrospinal fluid collects in the brain because of poor circulation and absorption of that fluid and which causes abnormal pressure to be placed on her brain tissue.
Shortly after Reagan’s birth, a special tube called a “shunt” was placed into her brain to help control her hydrocephalus by draining excessive cerebrospinal fluid into her peritoneal cavity. As she has grown older, Reagan has undergone multiple neurosurgical procedures for revision of her shunt, which has malfunctioned several times and caused severe fluid compression of her brain. In November 1981, approximately six months before her episode of meningitis, Reagan scored a 99 on an IQ test, indicating that at that time she possessed an average intelligence.
A. Dr. Didea’s Treatment
At approximately 2:00 a.m. on April 24, 1982, Reagan’s parents took her to the emergency room at the Children’s Hospital, located in Birmingham. She was suffering from fever, diarrhea, and vomiting. Reagan was seen by one of her pediatricians, Dr. Polhill, who admitted her to the hospital and put her on intravenous fluids. Later that day she was also seen by Dr. Didea, a second-year resident at the University of Alabama School of Medicine, and Dr. Reynolds, her other pediatrician. Reagan’s condition improved, and on the morning of April 25, after Dr. Didea had observed her and discussed her condition with Dr. Reynolds, her doctors decided that she could be dismissed.
However, before Reagan’s discharge, her mother noticed that she was favoring her neck, and her mother asked if Reagan could be examined for meningitis. Dr. Didea observed Reagan’s condition, cheeked her neck, and concluded that she showed no sign of meningitis. However, Dr. Didea failed to record the extent and thoroughness of this examination in Reagan’s medical records. Reagan was discharged from Children’s Hospital at 10:50 a.m., April 25, with orders to return to see her pediatrician, if she needed to.
Reagan’s parents took her home, but that afternoon her temperature increased and they returned to the emergency room of Children’s Hospital. The emergency room doctors determined that Reagan might have a shunt malfunction, and she was sent to the emergency room at the University of Alabama at Birmingham (“UAB”) Hospital for neurological evaluation. Reagan came into the UAB Hospital emergency room at 4:50 p.m. on April 25 and was seen by Dr. Zeiger, the neurosurgeon on call, and Dr. Kendrick, a third-year neurosurgical resident.
Because Dr. Zeiger’s treatment of Reagan is the focus of this appeal, we have examined it in great detail. The order in which the facts are set forth below accurately represents the chronology of events in Dr. Zeiger’s treatment of Reagan, although these facts do not necessarily appear in the record in the same order.
B. Dr. Zeiger’s Treatment
1. Upon Reagan’s arrival at the UAB Hospital emergency room at 4:50 p.m. on April 25, Dr. Zeiger noted that Reagan had been released from Children’s Hospital earlier that day, after suffering from fever, vomiting, and diarrhea. She presented to the UAB emergency room with a rigid neck and a low fever.
2. Dr. Zeiger’s initial admitting diagnosis for Reagan was meningitis, and he ordered that she be treated with the antibiotic Mefox-in; however, the hospital staff did not administer it at that time. Dr. Zeiger was also concerned that Reagan’s shunt might be malfunctioning; a shunt malfunction is a common problem for children with shunts.
8. A tap of Reagan’s shunt yielded cere-brospinal fluid, indicating that fluid was moving through the shunt and that the shunt was functioning properly.
4. Once a shunt malfunction was ruled out, Dr. Zeiger’s next concern was the possibility of a shunt infection without a concurrent malfunction of the shunt.
5. Dr. Zeiger examined the fluid drawn from Reagan’s shunt and found that the levels of protein and white blood cells were normal; the normal levels indicated that there was no infection of the cerebrospinal fluid in her brain.
*797 6. Dr. Zeiger and Dr. Kendrick reviewed the other possible causes of Reagan’s illness, which was still symptomatic of meningitis.
7. Dr. Zeiger eventually theorized that the Arnold-Chiari malformation of Reagan’s brain, extending into the spinal canal, may have developed to such an extent as to create a separate compartment of spinal fluid that did not circulate completely with the other areas of her spinal canal and her brain, as would normally occur. He believed that it was possible that so much of Reagan’s brain may have protruded into her upper spinal canal as to create a compartment that spinal fluid could enter through what would effectively be a one-way valve, but could not thereafter circulate through the rest of Reagan’s spinal column and her brain.
8. Dr. Zeiger decided that it was necessary to do a spinal tap to obtain a sample of Reagan’s cerebrospinal fluid from a point other than her shunt tube. However, a normal spinal tap was not possible, because the myelomeningocele deformation in Reagan’s lower spinal column caused her to not have the fluid sack at the base of her spinal column where such taps are normally performed.
9. Before the spinal tap was done, a CAT scan of Reagan’s brain was performed. The CAT scan was normal for a child with Reagan’s abnormalities and revealed no any sign of infection affecting brain tissue.
10. Dr. Kendrick performed the spinal tap at 10:30 p.m. on April 25. Examination of the spinal fluid sampled by Dr. Kendrick’s spinal tap showed that Reagan did have an infection in an area of cerebrospinal fluid that was not in circulation with the cerebro-spinal fluid being drawn from her brain by the shunt.
11. Based on his knowledge that 96% of all shunt-related meningitis infections are caused by Staphylococcus bacteria, Dr. Zeiger ordered that Reagan be admitted and treated with the antibiotic Mefoxin. Dr. Zeiger continued with his diagnosis that the meningitis infection was related to Reagan’s shunt, even though the spinal fluid drawn from the shunt itself was not infected. Dr. Zeiger chose not to put Reagan on the antibiotic ampicillin.
12. The antibiotic Mefoxin was not actually administered to Reagan until 8:00 a.m. on April 26, more than k hours after her spinal tap and 10 hours after she had been come into the emergency room with an initial diagnosis of meningitis. Mefoxin was again administered to Reagan at 6:00 a.m.
13. Laboratory testing of Reagan’s infected spinal fluid later revealed that it was infected by Hemophilus influenza, the most common cause of meningitis in young children, and not Staphylococcus bacteria as Dr. Zeiger had assumed. Because of the laboratory results, the medication for Reagan’s meningitis was changed from Mefoxin to a combination of ampicillin and chlorampheni-col, antibiotics that are more specific for Hemophilus influenza meningitis and that are the standard treatment for that particular illness.
14. Reagan was transferred to Children’s Hospital after 9:00 a.m. on the morning of April 26, and she finally underwent treatment with ampicillin and chloramphenicol, more than 16 hours after she was first seen by Dr. Zeiger at the UAB Hospital emergency room with symptoms of meningitis.
15. Reagan’s condition deteriorated greatly and she was near death before she recovered and was able to be discharged. She remained in Children’s Hospital until May 15, 1982.
C. Reagan’s Condition Following Hemophilus Influenza Meningitis
During Reagan’s hospitalization for meningitis, she nearly died; she suffered temporary blindness and hearing loss, although her sight and hearing returned shortly after her discharge. She also began to suffer seizures, and she continues to take medication to prevent seizures. She developed a condition called nystagmus, or “dancing eyes,” which causes her difficulty in focusing her vision.
Notably, in July 1984, two years after Reagan’s illness with meningitis, she scored 98 on an IQ test — nearly identical to her score of 99 on the test given six months before her meningitis. However, several years later, in *798 January 1987, she scored 72. Finally, in May 1990, Reagan scored only 59, indicating that her intelligence had decreased to a very low level.

II.Procedural History

As noted previously, in February 1987, Reagan brought medical malpractice claims against Children’s Hospital, the Foundation, Dr. Polhill, Dr. Reynolds, and Dr. Didea; the claims related to the diagnosis and treatment of her meningitis. Reagan’s parents also brought individual claims against the same defendants. It is worth noting that neither Dr. Zeiger nor Dr. Kendrick was named as a defendant in the action.
The individual claims brought by Reagan’s parents were dismissed by the trial court as untimely. Drs. Polhill and Reynolds were dismissed by stipulation. Thereafter, in February 1993, the trial began against Children’s Hospital, the Foundation, and Dr. Didea. Reagan claimed at trial that Dr. Didea was negligent in failing to properly examine her and evaluate her condition before her initial discharge from Children’s Hospital on April 25, 1982. She also claimed that Dr. Didea was an agent of the Foundation, so that the Foundation was vicariously liable for Dr. Didea’s negligence, under the doctrine of re-spondeat superior. Reagan further alleged that the Foundation was also vicariously liable for the negligence of Drs. Zeiger and Kendrick, who treated her after her transfer to UAB Hospital on the evening of April 25, 1982.
The Foundation is a nonprofit professional corporation established by the faculty of the University of Alabama School of Medicine and, in part, acts as a billing service for those physicians. Only physicians on the faculty of the medical school and third-year medical residents receive income from the Foundation. It is clear from the record that Dr. Zeiger was an employee of the Foundation at the time he treated Reagan Bush.
The jury returned a verdict in favor of the Children’s Hospital and Dr. Didea, but found the Foundation liable and awarded $1,500,000 in damages. The Foundation renewed its motion for a directed verdict through a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion for JNOV or a new trial. The Foundation has appealed from a judgment entered on the verdict.

III.Issues

The Foundation contends that the trial court erred in denying its motion for JNOV or a new trial because (1) it claims that Reagan failed to prove by expert testimony that an agent of the Foundation breached the appropriate standard of medical care, (2) it claims that Reagan failed to prove by expert testimony that the alleged medical malpractice proximately caused her injury; and (3) it claims that the trial judge gave an erroneous charge to the jury regarding the legal standard for determining causation in a medical malpractice case.

IV.Standard of Review

“A motion for JNOV is properly granted only when: 1) there is either (a) a complete absence of proof on a material issue of fact or (b) no factual controversy upon which reasonable people could differ; and 2) the movant is entitled to a judgment as a matter of law.” Baptist Memorial Hosp. v. Bowen, 591 So.2d 74, 76 (Ala.1991); Deaton, Inc. v. Burroughs, 456 So.2d 771 (Ala.1984). In sum, a JNOV should be granted only if “there can be only one reasonable conclusion from the evidence as to the proper judgment.” Luker v. City of Brantley, 520 So.2d 517, 521 (Ala.1987).
Because the Foundation’s motion for JNOV tests the sufficiency of the evidence supporting Reagan’s claim, we must perform our review of the trial court’s denial of the motion with the proper burden of proof in mind. In a medical malpractice case, the plaintiff must prove by expert testimony that the physician breached the standard of care and by the breach proximately caused the plaintiffs injury. Levesque v. Regional Medical Center Bd., 612 So.2d 445, 448 (Ala.1993); Dobbs v. Smith, 514 So.2d 871 (Ala.1987).
However, the law does not place the physician at the mercy of professional colleagues. Where several methods of treatment would be appropriate, a physician choosing one of those appropriate methods is not shown to have breached the standard of *799 care by testimony of the plaintiffs expert that the expert would have chosen a different one. Hines v. Armbrester, 477 So.2d 302, 307 (Ala.1985); Sims v. Callahan, 269 Ala. 216, 225, 112 So.2d 776, 783 (1959).
The Foundation also moved, in the alternative, for a new trial, based on the contention that the court had given an erroneous charge to the jury. This Court has said, “A strong presumption of correctness attaches to a trial court’s ruling on a motion for new trial, and the ruling will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.” McDowell v. Key, 557 So.2d 1243, 1246 (Ala.1990). However, “where the record reveals that an erroneous charge is given to the jury, a new trial is required.” McDowell, 557 So.2d at 1246.
V. Sufficiency of Evidence on Alleged Breach of Standard of Care
We first note that the Foundation’s liability in this case is based on the doctrine of respondeat superior, or vicarious liability. However, the Foundation’s liability cannot be founded on the alleged negligence of Dr. Didea, who Reagan claimed was an agent of the Foundation. The jury found that Dr. Didea was not negligent in his treatment of Reagan. Under the doctrine of respondeat superior, the master cannot be liable unless one of the master’s servants has been found to be negligent. Otwell v. Bryant, 497 So.2d 111 (Ala.1986).
However, we have ruled: “Where the liability of the master may be rested on ... 'the negligence of employees other than the employee who was made a defendant, a verdict against the master, but exonerating the employee who was made a defendant, is not inconsistent.” Atlantic Coast Line R.R. v. Kines, 276 Ala. 253, 258, 160 So.2d 869, 873 (1963). Thus, in this case, the Foundation’s liability must rest, if at all, on the negligence of an employee who was not named as a defendant.
To support her claim of medical malpractice against the Foundation, Reagan offered the expert testimony of Dr. Lloyd Olson, a pediatrician specializing in pediatric infectious diseases, and offered information from several medical treatises. In addition to his testimony relating to Dr. Didea, Dr. Olson offered testimony regarding the actions of Dr. Zeiger, an employee of the Foundation who was not named as a defendant. Dr. Olson was generally not critical of Dr. Zeiger’s action’s taken until the time of Reagan’s spinal tap. His testimony focused on Dr. Zeiger’s decision to treat Reagan’s meningitis, which, when the decision was made, was still unidentified as to the exact type of infection, with the antibiotic Mefoxin rather than with a combination of ampieillin and chloramphenicol, which was the recognized standard treatment for childhood meningitis.
On direct examination, Dr. Olson testified:
“[DR. OLSON]: Yes. I mean, they— they appreciated the fact that her neck was stiff; that this indicated an infection or possibility of an infection of the central nervous system. A shunt infection, again, would certainly be at the top of the list. They took this fluid off for analysis. That proved to be normal.
“So then they proceeded with the next step, which would be on the list, meningitis; and they did the lumbar puncture and found that she, indeed, had meningitis.
“[ATTORNEY FOR REAGAN]: All right, doctor. And what treatment was instituted?
“[DR. OLSON]: Well, an antibiotic was ordered, which is called Mefoxin and— although that was not administered until, I think, three o’clock the next morning.
“[ATTORNEY FOR REAGAN]: All right, sir. Was that appropriate treatment in your opinion?
“[DR. OLSON]: No, it was not. In a child this age, there are three main different kinds of bacteria which might cause this kind of infection, and there’s a standard antibiotic regimen, at least there was at that time, that would be used empirically to cover all those three possibilities and actually most of the others that would occur also, which are two antibiotics called ampieillin and chloramphenicol. That’s a regimen that’s been in place since probably the late 1960’s for this clinical situar tion.

*800
“Mefoxin is an antibiotic which is not indicated for any central nervous system infection and would not have the spectrum ■nor tissue level required to treat these kinds of infections.

[[Image here]]
“[ATTORNEY FOR REAGAN]: In your opinion, what antibiotic should have been given?
“[DR. OLSON]: Well, the standard regimen which in 1982, I think, virtually all pediatric infectious disease [physicians] or all pediatricians would adhere to would have been the combination of ampicillin and chloramphenicol because it directly was effective against those most common bacteria that cause meningitis in children.
[[Image here]]
“[ATTORNEY FOR REAGAN]: Doctor, based on the facts that you’ve stated that the doctors at the University Hospital failed to administer — I better ask you this.

“Was the failure to administer chloram-phenicol and ampicillin from 10:30 at night until nine the next morning, was that a deviation from the standard of care ordinarily exercised in the national medical community in 1982, in your opinion?

“[DR. OLSON]: In my opinion the standard of care was to administer effective antibiotics as soon as possible after the diagnosis was made.”
(Emphasis added.)
Reagan’s counsel also offered medical treatises as evidence of the proper standard of care for the treatment of meningitis. In sum, those treatises tended to show that it is critical to begin treating meningitis with an effective antibiotic as soon as possible and that the family of drugs to which Mefoxin belongs was not effective in the treatment of meningitis.
The counterpoint to Dr. Olson’s expert testimony and the information from medical treatises admitted into evidence is the testimony of Dr. Zeiger, Reagan’s attending neurosurgeon at UAB Hospital, who, upon finding that Reagan had an infection in her spinal fluid, ordered that she be treated with Mefoxin rather than a combination of ampi-cillin and chloramphenicol. In defense of his choice of the antibiotic Mefoxin, Dr. Zeiger testified as follows:
“[ATTORNEY FOR FOUNDATION]: Now, what antibiotic did you start with Reagan there after the spinal tap?
“[DR. ZEIGER]: We had a long discussion about what would be the very best treatment for Reagan. Again, we’ve got a rare situation. We’ve got a situation that we’ve never seen or heard of. We had evidence of infection that was compartmentalized in one area and not present in the brain. And based on experience and what we had been taught in the presence of a shunt ninety-six to ninety-nine percent of infections are due to Staphylococcus. Virtually, all infections in the presence of a shunt are due to Staphylococcus.
“[ATTORNEY FOR FOUNDATION]: Now, tell us what staphylococcus is.
“[DR. ZEIGER]: That’s a bug that is present on everybody’s skin. And in the presence of a shunt, which is a foreign body, without a shunt it’s usually not a pathogen, meaning it usually can’t cause an infection. But when you have a shunt, which is a foreign body, inside the body invading the body, it lowers the body’s resistance to infection, and that’s why these children are more prone to infection.
“In the presence of a shunt, the Staphylococcus which is on the skin can either get through the skin or could have gotten on the shunt when it’s put through the skin and can cause infection. And so that’s why ninety-six to ninety-nine percent of them are due to Staphylococcus.
“[ATTORNEY FOR FOUNDATION]: Now, you knew you had already tapped the shunt, and you knew that you didn’t have infection there in the fluid in the shunt.
“[DR. ZEIGER]: Yes, sir.
“[ATTORNEY FOR FOUNDATION]: Did you still suspect that it might be a staph infection even though you didn’t find infection there in the shunt?
“[DR. ZEIGER]: Yes, sir.
“[ATTORNEY FOR FOUNDATION]: And why would that be?
*801 “[DR. ZEIGER]: Well, it could be that the infection had just not gotten that far yet or could have been in another part of the shunt — you see the fluid we got was out of the ventricle, but remember I showed you on the surface of the brain there was some more fluid, and we thought that there could have been Staphylococcus there. So even in that situation the most likely hug was Staphylococcus because there [were] other places that the shunt could have been touching that could be infected. And sometimes the infection is on the outside of the shunt and not the inside. These staphylococcal infections are fairly slow growing things, and it takes them some time to crawl along and get to different areas of the shunt.
“[ATTORNEY FOR FOUNDATION]:

Why did you choose Mefoxin as an antibiotic to use in treating this?

“[DR. ZEIGER]: Mefoxin is what’s called a third generation cephalosporin, meaning it was one of — at that time it was fairly new. It’s a very safe drug, very little allergic reaction to it. It also has a broad spectrum of coverage. In other words, it covers a lot of different bacteria. It’s very good for Staphylococcus.... It covers Hemophilus influenza and many other gram negative bugs. And the most common — even though the chance of her having another kind of meningitis like Hemophilus influenza were only one or two percent, it would still cover that.
"... It would cover a lot more bugs than ampicillin. Ampicillin does not cover Staphylococcus, which is what this was ninety-six percent of the time. And so it seemed like an excellent choice of drug at the time.”
(Emphasis added.)
Dr. Zeiger further explained his decision to treat Reagan with Mefoxin rather than ampicillin and chloramphenicol:
“[ATTORNEY FOR FOUNDATION]: Now, Dr. Zeiger, would you agree with Dr. Olson if he testified that Reagan should have been placed on ampicillin and chlo-ramphenicol immediately upon obtaining the shunt tap rather than — I mean, the spinal tap — rather than Mefoxin?
“[DR. ZEIGER]: No, sir. That would have been a stupid thing to do.
[[Image here]]
“[ATTORNEY FOR FOUNDATION]: Okay,' are there any risks involved — well, would it have been good medical practice to administer ampicillin and chloram-phenicol to treat a child that comes in with an infection that has a shunt?
“[DR. ZEIGER]: No, sir.
“[ATTORNEY FOR FOUNDATION]: And why would that be?
“[DR. ZEIGER]: Because ninety-six percent of the time — what we’re talking about is the initial treatment. See, the problem is you don’t know what’s causing the infection when they come in.... And so you have to go with the odds until you get the final results from the test[s] that show what’s causing the infection. So it makes sense to use an antibacterial, an antimicrobial, an antibiotic that covers both staph and Hemophilus influenza, not just one that covers Hemophilus influenza. Ampicillin is no good for staph. Staph would grow like crazy and then you’ve got trouble.”
(Emphasis added.)
After hearing all of this conflicting testimony, the jury found that the Foundation was liable for negligent treatment of Reagan’s meningitis. As noted previously, the only physician on which the Foundation’s vicarious liability could be based would be Dr. Zeiger or Dr. Kendrick. Thus, the first issue we must face is whether Dr. Olson’s expert testimony and the information from medical treatises also offered by Reagan, taken as a whole, represented a “scintilla” of evidence that either Dr. Zeiger or Dr. Kendrick was negligent in diagnosing and treating Reagan’s Hemophilus influenza meningitis, which would make that issue a proper question for the jury. A “scintilla of evidence” has been defined by this Court as a mere spark, gleam, glimmer, i.e., the smallest trace, of evidence in support of a plaintiffs claim. Ricwil, Inc. v. S.L. Pappas, & Co., 599 So.2d 1126 (Ala.1992); Howard v. Crowder, 496 So.2d 31 (Ala.1986).
*802 After thoroughly reviewing the record, we conclude that the evidence presented by Reagan met this test. In sum, the medical treatises and Dr. Olson’s testimony presented at least a “scintilla” of evidence that Dr. Zeiger’s treatment of Reagan fell below the applicable standard of care for treating a case of pediatric meningitis, once Dr. Zeiger’s treatment continued to be based on the assumption that the meningitis was caused by a shunt-related Staphylococcus infection even though the shunt tap had revealed that the shunt fluid was not infected. Dr. Olson testified that once Dr. Zeiger realized that Reagan was suffering from meningitis even though her shunt fluid was not infected, the medical standard of care required that one treatment regimen be followed — administration of the antibiotics ampicillin and chloram-phenicol. Dr. Olson testified that Dr. Zeiger’s treatment of Reagan breached this standard of care. Accordingly, the trial court properly denied the Foundation’s motion for a JNOV on this issue.
VI. Sufficiency of Evidence on Causation
The second issue on appeal is whether Reagan offered sufficient evidence, through expert testimony, that Dr. Zeiger’s negligence in delaying proper treatment of her Hemophilus influenza meningitis proximately caused the injuries that she claims to have suffered. To prove causation in a medical malpractice case, the plaintiff must prove, through expert medical testimony, that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury. Willard v. Perry, 611 So.2d 358 (Ala.1992); Peden v. Ashmore, 554 So.2d 1010 (Ala.1989). See also Tidwell v. Upjohn Co., 626 So.2d 1297 (Ala.1993). Again, our review of this issue is constrained by the “scintilla” rule applicable to this case.
Reagan claimed that as a result of the delay in treating her Hemophilus influenza meningitis with ampicillin and chlorampheni-col antibiotics, she suffered a significant loss in intelligence, as measured by IQ tests; that she developed nystagmus, or “dancing eyes,” which she says has adversely affected her ability to focus her vision; and that she continues to suffer from and to be treated for seizures. The jury awarded $1,500,000 in damages for Reagan’s injuries.[1]
As noted previously, Reagan scored 99 on an IQ test given to her in 1981, some six months before her episode of meningitis. At trial, Reagan offered into evidence the results of that test and two other IQ tests given to Reagan several years later. In January 1987, she scored 72 on an IQ test and in May 1990, she scored only 59. Reagan offered these three tests, along with expert testimony by Dr. Olson, as evidence that the delay in properly treating her meningitis proximately caused her to suffer a significant loss of intelligence.
Dr. Olson was not specifically questioned as to the basis for his belief that Reagan’s intelligence had declined as a result of her meningitis and was not expressly made aware during his testimony that Reagan had taken an IQ test in July 1984, two years after her episode of meningitis, or that she had scored 98 — statistically identical to her IQ score of 99 from six months before her episode of meningitis. Even so, the jury was entitled to believe Dr. Olson’s expert opinion on the medical causation of Reagan’s lowered intelligence. That testimony represents the “scintilla” of evidence necessary to make the issue of proximate cause a jury question.
We next focus on Reagan’s other injuries — nystagmus and seizures. Reagan also offered the expert testimony of Dr. Olson as evidence that her nystagmus and seizures were proximately caused by Dr. Zeiger’s delay in effectively treating her meningitis. Regarding the medical causation of Reagan’s injuries, Dr. Olson testified:
“[COUNSEL FOR REAGAN]: In essence the question is: What adverse consequences did Reagan suffer as a failure for [her] meningitis to have been timely diagnosed and treated?
[[Image here]]
“[DR. OLSON]: She was left over the ensuing period of time unable to see, unable to speak, developed seizures, the nys-tagmus or jerky eye movements, which appeared during hospitalization, and her *803 intelligence quotient or tests, as best they could be carried out in a child of this age, previously were said to be normal.
“She was said to be — in fact, one of Dr. Reynolds’ notes said she was a delightfully interactive little girl. Subsequently, [she] was tested as below normal.
[[Image here]]
“[COUNSEL FOR REAGAN]: All right. Do you have an opinion to a reasonable degree of medical certainty as to whether or not the failures you mentioned to meet the proper standard of care caused or contributed to any adverse effects to Reagan Bush?
“[DR. OLSON]: Yes, I do.
“[COUNSEL FOR REAGAN]: Would you tell us what that opinion is?
“[DR. OLSON]: I think that failure contributed to progression of the disease with neurological damage occurring as a result of that progression.
“[COUNSEL FOR REAGAN]: All right, sir. Doctor, in assuming she had seizures and poor learning ability, nystag-mus as long-term conditions, do you have an opinion as to whether or not those conditions were secondary to the delay in treatment of meningitis?
“[DR. OLSON]: Yes, I do.
[[Image here]]
“[COUNSEL FOR REAGAN]: Tell us that opinion, doctor. I thought you did.
“[DR. OLSON]: Yes, I had an opinion. And I think that delay contributed to the neurological damage that occurred.
“[COUNSEL FOR REAGAN]: Okay, do you think they were causative or the meningitis was causative of these factors?
“[DR. OLSON]: Yes.”
(Emphasis added.)
Dr. Olson’s testimony is supported by that of Dr. Reynolds, one of Reagan’s pediatricians, who stated that she had had no sign of nystagmus or seizures before her episode of meningitis. Based on the whole of this expert testimony, we find that Reagan met her burden on the issue of proximate causation by presenting at least a “scintilla” of evidence, by expert testimony, that her nystag-mus and seizures were probably caused by the delay in treating her meningitis with ampicillin and chloramphenicol. Thus, the issue of causation as to Reagan’s nystagmus and seizures also became a question of fact for the jury to decide.
Given that Reagan offered at least a “scintilla” of evidence, by expert testimony, that the delay in treating her meningitis with effective antibiotics was the proximate cause of her lowered intelligence, and of her nys-tagmus and seizures, the trial court properly denied the Foundation’s motion for a JNOV on that issue.
VII. The Jury Charge on Causation
As a part of the trial court’s charge to the jury on medical causation, at the request of Reagan’s counsel the trial judge quoted a passage from this Court’s opinion in Parker v. Collins, 605 So.2d 824 (Ala.1992). Defense counsel objected to that charge as confusing, and now the Foundation contends that the instruction was misleading and incomplete and improperly lowered the standard of proof on that issue. The language from Parker at issue is: “It is not necessary to establish that prompt care would have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence.” 605 So.2d at 827.
The Foundation argues that this instruction, coming at the end of the trial judge’s jury charge on medical causation, improperly relaxed the standard on medical causation from the requirement that the plaintiff show that the negligence “probably caused” the injury. The Foundation further contends that if this Court rules that the language from Parker is a proper charge under the facts of this case, then we will be changing the law of medical causation in Alabama.
We disagree. The general facts of Parker and the facts of this case are quite similar. In Parker, the plaintiffs sued a physician and a hospital, alleging that after Mrs. Parker sought medical treatment regarding a lump in her breast, Dr. Collins negligently performed her mammogram and then negligently interpreted it to be negative for cancer. 605 So.2d at 825. Several months later, an *804 other physician diagnosed her breast cancer, which by then had spread into her lymph nodes, requiring a radical mastectomy of her entire breast and lessening her chances for long-term survival. Id. at 826. Thus, in Parker, the issue was whether the physician’s negligence, which caused a delay in diagnosis and proper treatment of the plaintiffs breast cancer, caused her condition to be adversely affected. Similarly, in this case, the issue was whether Dr. Zeiger’s delay in providing proper treatment of Reagan’s meningitis caused her condition to be adversely affected. Thus, we conclude that the jury charge was proper, given the facts of this ease.
Further, as the Foundation has noted, any alleged error in a trial court’s jury instructions must be reviewed in the context of the entire charge and not taken in isolation. Sewell v. Internal Medicine & Endocrine Associates, P.C., 600 So.2d 242 (Ala.1992). Reviewing the charge as a whole, we conclude that the trial judge properly instructed the jury that the standard of proof for determining medical causation was that the plaintiff must prove that the negligence “probably caused” the plaintiffs injury, not simply that it “possibly caused” the injury. Thus, we find no reversible error in the court’s jury charge on the standard of proof for determining medical causation. Accordingly, we hold that the trial court’s properly denied the Foundation’s motion for a new trial.
The judgment is affirmed.
AFFIRMED.
HOUSTON, KENNEDY, INGRAM and COOK, JJ., concur.

. The Foundation’s appeal does not contest the award as excessive.