PER CURIAM.
Sheila Miller (“Miller”), as administra-trix of the estate of George Miller, M.D. (“Dr. Miller”), deceased, appeals from an adverse judgment of the Etowah Circuit Court on Velisa Lynn Bailey’s claim of medical negligence regarding the second of two major surgeries Dr. Miller performed on Bailey while she was under his care (case no. 1071624). Bailey appeals from a judgment as a matter of law in favor of Miller on Bailey’s claim of wantonness against Dr. Miller arising out of the same surgery (case no. 1071665). In addition, Miller contends that the trial court erred in declining to submit her proposed verdict form to the jury. We affirm the judgment of the trial court as to each matter.

I. Facts and Procedural History

Before Bailey sustained the injuries she contends occurred at the hands of Dr. Miller, she was a registered nurse at Gadsden Regional Medical Center (“Gadsden Regional”). There is no dispute that Bailey suffered from gastroesophagal reflux disease, meaning that gastric juices from her stomach flowed up into her esophagus, causing severe heartburn. In order to alleviate the problem, on September 26, 2000, Dr. Miller, assisted by Dr. Tracy Lowery, performed a laparoscopic Nissen fundoplication (“stomach-wrap surgery”) on Bailey at Gadsden Regional.[1]
The day after the surgery Bailey was released from the hospital. Sometime before midnight of that day, however, Bailey awoke suffering from shortness of breath and a “stabbing” pain in her chest. Bailey was readmitted to Gadsden Regional, evaluated by Dr. Miller, provided a shot of Demerol, and discharged. In the early morning of September 29, Bailey again awoke with a sharp pain in her chest and shortness of breath. She was again admitted to Gadsden Regional, but this time her condition deteriorated. Tests revealed that large amounts of fluid were accumulating in her chest and that opacification had occurred in her right chest cavity. On September 30, a pint of fluid was drained from Bailey’s chest.
On October 1, 2000, Dr. Miller performed a thoracotomy[2] on Bailey in order to determine the source of her problems. In the surgery, Dr. Miller discovered, as he stated in his deposition, that Bailey had “a lot of inflammation and what we call an inflammatory peel around the [right] lung that comes from protein deposits that turn into — it’s almost like a scab, but it’s not a mature scab.” The inflammatory peel had caused Bailey’s right lung to be stuck to the wall of her chest. As a result, the inflammatory peel had to be scraped and removed in order to free her lung. In addition, as Dr. Miller’s notes on the surgery indicated, “the fundus of the stomach which had been plicated [wrapped] around the esophagus had a very tiny perforation in the right lateral portion of the [stomach] wrap. This had drained into the mediasti-num [3] and into the right chest.” In his *860 surgical notes, Dr. Miller described the perforation as “a very tiny (1 to 2 mm) perforation in the stomach.” Dr. Miller closed the perforation with two sutures and then folded over a portion of the me-diastinal wall and sutured it in place as extra covering for the perforation.
Following the surgery, Bailey seemed to improve. The fluid that was drained from her chest became less opaque, and it decreased in volume. She began breathing better on her right side, and, according to his discharge summary, Dr. Miller “felt there was a good chance the leak had been closed.” Starting on October 6, however, Bailey started to feel more discomfort. By October 8, she had decreased breath sounds over her right lung and a persistent cough. Chest x-rays taken on October 9 revealed that Bailey again had free fluid in her right chest cavity, and the chest tubes that had been inserted were not satisfactorily draining it. Consequently, Dr. Miller performed another surgery in which he attempted to insert more chest tubes to drain the fluid, but he was unable to do so because Bailey’s lung was “tightly” stuck to the chest wall. On October 10, a radiologist inserted a chest tube with the use of CT guidance, and he removed more than one-half pint of fluid.
Despite the presence of the new drainage tube, additional fluid accumulated in Bailey’s chest. Because Bailey was not getting better, on October 11, 2000, Dr. Miller decided to transfer her to the care of Dr. Henry Laws at Carraway Methodist Medical Center (“Carraway”). Dr. Miller had been in communication with Dr. Laws for the preceding week concerning Bailey’s case because, unlike Dr. Miller, Dr. Laws previously had handled stomach-wrap patients who had sustained stomach perforations.
Upon arriving at Carraway, Bailey was immediately taken to surgery, where another chest tube was inserted in an effort to drain from her chest the fluid that was leaking from her stomach. The next day, Dr. Laws performed another thoracotomy on Bailey in order to scrape inflammatory peel off her right lung. He also inserted a feeding tube to enable Bailey to receive liquid nutrition, as well as two new chest tubes. Following this surgery, Bailey’s condition somewhat stabilized, and the second chest tube that had been inserted was removed on October 17.
Bailey remained at Carraway under the care of Dr. Laws for the majority of the next two months. She was discharged twice during that period, but she was forced to return because of persistent nausea. Dr. Laws eventually determined that the nausea was a symptom of withdrawal resulting from her body’s becoming addicted to the pain killer Demerol, which had been administered to her during her protracted stays in the hospital.
Swallowing studies periodically administered over this two-month period indicated additional leakage from Bailey’s stomach and fluid in her chest. In a patient history dated December 8, 2000, and entered into evidence, Dr. Laws concluded that the leakage of acidic fluid from Bailey’s stomach into her chest had eroded pulmonary tissue and had created a gastrobronchial fístula.[4] He also noted that Bailey again had started to experience reflux from her stomach back into her esophagus, which he surmised was occurring because the stomach wrap had migrated from Bailey’s abdomen to her chest causing “inadequate valvular effect to avoid reflux.” As a result of these problems, Dr. Laws recommended that Bailey undergo another surgery to repair the fistula and to reverse and redo *861 the stomach wrap. On December 11, 2000, Dr. Laws performed the recommended surgical procedures.
Following the December 11, 2000, surgery, Bailey began to recover. The second stomach wrap resolved the acid reflux, and the fístula repair stopped the remaining leakage from her stomach into her chest cavity. As a result of her injuries, Bailey was not able to return to her work as a nurse at Gadsden Regional, and she began receiving Social Security income based on a total disability.
On September 24, 2002, Bailey sued Dr. Miller and Dr. Joseph A. Foster,[5] alleging, in pertinent part, that Dr. Miller had negligently and/or wantonly breached the standard of care by perforating Bailey’s stomach during the September 26, 2000, stomach-wrap surgery, and by attempting to repair the perforation during the October 1, 2000, thoracotomy by suturing inflamed tissue. Dr. Miller answered Bailey’s complaint and denied the allegations. Blue Cross and Blue Shield of Alabama filed a motion to intervene as a plaintiff based on a subrogation interest as a result of paying Bailey’s medical expenses, and the trial court granted its motion on May 27, 2003.
On October 11, 2006, a suggestion of death was entered into the record showing that Dr. Miller had died. Bailey filed a motion to appoint Sheila Miller, Dr. Miller’s widow, as administrator ad litem, which the trial court subsequently granted. Miller then filed a motion for a partial summary judgment, which the trial court granted only as to a claim not in issue before us.
The case was tried before a jury beginning on May 5, 2008. At the close of Bailey’s case and at the close of all the evidence, Miller moved for a judgment as a matter of law on Bailey’s negligence and wantonness claims, contending that Bailey had failed to present substantial evidence showing that any act or omission of Dr. Miller proximately caused Bailey’s injuries and that Bailey’s wantonness claims also were not supported by substantial evidence. Finally, Miller requested that the trial court hold § 6-5-543, Ala.Code 1975, a part of the Alabama Medical Liability Act, constitutional[6] and that the verdict form reflect the periodic-payments provision of that section regarding any future damages awarded to Bailey.
The trial court entered a judgment as a matter of law in favor of Miller on Bailey’s wantonness claims, but denied Miller’s motion in all other respects. The trial court also declined to submit Miller’s proposed verdict form regarding future damages to the jury. The jury returned a verdict in favor of Bailey and awarded damages in the amount of $2 million. Miller filed a renewed motion for a judgment as matter of law, which the trial court denied.
Miller timely appealed the judgment on Bailey’s medical negligence claim. As in the trial court, she contends that there was insufficient evidence of causation as to that claim and that the trial court erred in its ruling related to the constitutionality of § 6-5-543, Ala.Code 1975. Bailey timely appealed the trial court’s judgment as a matter of law on her wantonness claim related to the thoracotomy performed by Dr. Miller.

*862
II. Standard of Review

“ ‘When reviewing a ruling on a motion for [a judgment as a matter of law], this Court uses the same standard the trial court used initially in granting or denying the [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must present substantial evidence to withstand a motion for [a judgment as a matter of law[7]]. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for [a judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).’ ”
National Ins. Ass’n v. Sockwell, 829 So.2d 111, 125-26 (Ala.2002) (quoting State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 302-03 (Ala.1999)).

III. Analysis

A. The Trial Court’s Judgment on Bailey’s Claim of Medical Negligence

At the outset, we note that Miller does not dispute that Bailey presented substantial evidence of medical negligence in relation to the stomach-wrap surgery Dr. Miller performed on September 26, 2000. Rather, Miller contends solely that Bailey failed to present substantial evidence that any act or omission by Dr. Miller during the thoracotomy performed on October 1, 2000, caused injuries to Bailey.
“To prevail on a medical-malpractice claim, a plaintiff must prove ‘ “1) the appropriate standard of care, 2) the doctor’s deviation from that standard, and 3) a proximate causal connection between the doctor’s act or omission constituting the breach and the injury sustained by the plaintiff.” ’ Pruitt [v. Zeiger], 590 So.2d [236,] 238 [(Ala.1991) ] (quoting Bradford v. McGee, 534 So.2d 1076, 1079 (Ala.1988)).”
Giles v. Brookwood Health Servs., Inc., 5 So.3d 533, 549 (Ala.2008).
“A plaintiff in a medical-malpractice action must ... present expert testimony establishing a causal connection between the defendant’s act or omission constituting the alleged breach and the injury suffered by the plaintiff. Pruitt v. Zeiger, 590 So.2d 236, 238 (Ala.1991). See also Bradley v. Miller, 878 So.2d 262, 266 (Ala.2003); University of Alabama Health Servs. Found., P.C. v. Bush, 638 So.2d 794, 802 (Ala.1994); and Bradford v. McGee, 534 So.2d 1076, 1079 (Ala.1988). To prove causation in a medical-malpractice case, the plaintiff *863 must demonstrate ‘ “that the alleged negligence probably caused, rather than only possibly caused, the plaintiffs injury.” ’ Bradley, 878 So.2d at 266 (quoting University of Alabama Health Servs., 638 So.2d at 802).”
Sorrell v. King, 946 So.2d 854, 862 (Ala.2006).
At trial, Bailey argued that Dr. Miller erred in attempting to repair the perforation in her stomach during the thoracoto-my he performed on October 1, 2000, by using sutures because the tissue surrounding the perforation was inflamed and thus, she says, too weak to hold together with sutures. Bailey contended the result was that, instead of healing, the perforation became larger and acidic fluid from Bailey’s stomach continued to leak into her chest cavity until Dr. Laws remedied the problem through his course of treatment at Carraway.
Miller contends that Bailey failed to demonstrate that Dr. Miller’s actions during the thoracotomy probably caused injuries in addition to those she sustained as a result of the stomach-wrap surgery. Specifically, she argues that the expert testimony elicited by Bailey at trial was insufficient to establish that Bailey sustained injuries as a result of Dr. Miller’s suturing of the perforation in Bailey’s stomach.
Bailey’s primary expert witness on the issue of Dr. Miller’s breach of the standard of care during the thoracotomy was Dr. Joseph Colella. In pertinent part, Doctor Colella testified with regard to this second surgery as follows:
“Q. [Bailey’s counsel:] Do you have an opinion ... as to how Dr. Miller’s approach to this repair violated the standard of care?
“A. Ido.
“Q. What is that opinion, please, sir? Explain to us.
“A. I think he tried to close a hole in an inflammatory area with inflammatory tissue.
“Q. What’s wrong with that?
“A. It’s just not going to hold the stitches. Those tissues are not in their normal state. They are not of the appropriate viability. Or they are not of the appropriate life-sustaining character that they have under normal circumstances to be able to place the stitch, tie the stitch, and not have that stitch either pull through or slowly but surely pull through or keep the tissues together and make them stick to each other.
“Q. Well, how else are you going to close it if you’re in the cavity and the chest cavity is bathed in these gastric juices and everything is inflamed and angry, how are you going to close suture — I mean, close the hole in the stomach?
“A. Somehow find healthy tissue to close it.
“Q. And what does the term ‘dissection’ mean?
“A. It means exposed or cut around or get to healthy tissue surgically. Or get to exposed, identify, deliver into—
“Q. In this context and in this operation, if you were going to dissect something, what would you dissect?
“A. Well, I would dissect this area or mobilize it such that I could find healthy tissue to put over the hole.
“Q. Is there any indication in this note at all that this doctor did any dissection of the inflamed material to get down to the healthy tissue?
“A. There isn’t.
“Q. Could any board certified surgeon have reasonably expected that these two sutures, covering it with the mediastinal wall that had been bathed in gastric juices would hold?
*864 “A. Not the way it was done here. If it’s not healthy tissue, it’s not going to hold.
“Q. Well, if there’s no healthy tissue in the chest cavity, what do you do to repair the hole?
“A. You can choose not to repair it and just drain it and get appropriate drainage. If that wasn’t the chosen option— or the other option is to completely undo the wrap, bring it to a position in the body, whether that be in the abdomen or the chest, most likely the abdomen where you have healthy tissue to work with. Replacing sutures in inflamed area where the tissue is angry and not prepared to hold those sutures basically guarantees ongoing trouble.
“Q. From looking at the records, that’s what she had, was ongoing trouble, isn’t it?
“A. It is.
[[Image here]]
“Q. We talked about [the October 1 surgery] earlier; I’m not going to go back through all that. [Dr. Miller’s] choice was to try to stitch it up or, as you said, an alternative way would be to leave it alone and do nothing?
“A. With adequate drainage.
“Q. With adequate drainage. You said really the way you looked back on this, the way you added it up was that the tissue really was like wet paper towels and wasn’t going to hold anything, true?
“A. That’s consistent with my experience, yes, sir.
[[Image here]]
“Q. Here’s my point: It really wouldn’t make any sense for a surgeon to try to sew into something that looked and felt like wet paper towels, would it?
“A. Would not.
“Q. It just doesn’t make any sense?
“A. That’s correct.”
Bailey also questioned Dr. Lowery — who had assisted Dr. Miller in the stomach-wrap surgery and who served as an expert for Miller — about the attempt to repair Bailey’s stomach perforation with sutures. In pertinent part, Dr. Lowery testified as follows:
“Q. Now, let’s talk for a minute to the thoracotomy on [October 1], You have reviewed the medical records because you, I guess, may be called as an expert also; is that correct?
“A. That’s correct.
“Q. And that repair that Miller did on the 1st, it was leaking seven to ten days later, wasn’t it?
“A. “When the fluid reaccumulated in the chest on the 8th or 9th, yes, sir.
“Q. It was leaking seven to ten days later?
“A. Correct.
“Q. Now, did the tissue — Back up. He stitched together two stitches where the hole in the stomach was, didn’t he?
“A. Yes, sir.
“Q. Now, if the tissue where those stitches go in was inflamed, you would agree that it’s probable that if that stitch doesn’t hold, the hole gets bigger?.
“A. No, sir. I disagree with that.
“Q. Do you remember being asked that in your deposition?
“A. No, sir, I don’t.
[[Image here]]
“Q. Look at line 10. Where you [were] asked, What was the point of stitching the perforation?’ Is that the question?
“A. Yes, sir.
“Q. Did you answer: ‘In hopes of helping it heal. I think it was acceptable to do that. I think it would have - been acceptable not to have done that.’ Was that your answer?
“A. Yes, sir.
“Q. Then we ask this question: ‘Assume for me that that one millimeter *865 perforation was inflamed. If you applied a stitch to that perforation, would that have a probability of making the hole larger if the stitch doesn’t hold?’ You were asked that question, and you answered — did you not answer under oath: ‘If the tissue where the actual stitch goes in is inflamed, then yes, I would agree.’
“A. Yes, sir. That’s what I answered.
“Q. And that’s true today, isn’t it?
“A. Yes, sir.
[[Image here]]
“Q. If there’s a lot of inflammation and if that tissue is inflamed that he stitched over, if the tissue where the actual stitch goes in is inflamed, then yes, you would agree that when it breaks, the hole gets larger?
“A. Yes, but to stitch it through inflamed tissue would also not be correct.
“Q. It would be an absolute gross violation of the standard of care, wouldn’t it?
“A. Dr. Miller did not do that.
[[Image here]]
“Q. If Dr. Miller closed with the two stitches on that opening in an inflamed area, that would be a gross breach of the standard of care, wouldn’t it?
“A. I apologize for not just saying yes or no. If the stitches went through nonhealthy tissue, yes, sir.
“Q. It would be a gross breach of the standard of care?
“A. It would be — Yes, sir.
[[Image here]]
“Q. But it would be easier to fix that leak, wouldn’t it, if you had good healthy tissue?
“A. Good healthy tissue is always better than unhealthy tissue, yes, sir.
“Q. And if you fix the leak with good, healthy tissue, there’s no reason to think it’s going to reopen, is there?
“A. You would anticipate it remaining closed, yes, sir.
“Q. In this case, that repair didn’t remain closed, did it?
“A. No, sir.
[[Image here]]
“Q. Now, you state that Dr. Miller wouldn’t have done this because in your opinion he’s a very highly qualified surgeon. Isn’t that the reason that you give as to why he wouldn’t have stitched together inflamed tissue?
“A. One of the reasons, yes, sir.
“Q. Well, if he had left the hole alone and not done anything, the hole wouldn’t have gotten any larger, would it?
“A. No, sir, would not have expected the hole to get any larger.
“Q. But if he did in fact stitch the hole together in inflamed areas and it came undone, then it’s probable that the hole got larger, isn’t it?
“A. In the theoretical situation that you have just described, the possibilities of it getting larger are there, yes, sir.
“Q. So if that in fact did happen, what Dr. Miller did was make the situation worse, didn’t it?
“A. No, sir. I don’t think it would have made the situation worse, because I don’t think the original hole would have sealed.
“Q. Well, isn’t a larger hole worse than a smaller hole?
“A. There’s no indication there was a larger hole.
“Q. I know. But if we get back to that tissue being inflamed and it was stitched together and it was stitched together and it came undone, it’s probable that the hole was larger, isn’t it?
“A. Sounds like we’re talking about a different case now, because it’s a theoretical situation that didn’t exist. But in your theoretical situation, yes, sir.”
*866 Miller contends that Dr. Colella’s testimony that Bailey encountered “ongoing trouble” as a result of Dr. Miller’s attempt to repair the perforation in Bailey’s stomach was too generalized to establish that Dr. Miller caused Bailey additional injury. She also observes that in Dr. Lowery’s testimony concerning the “hole getting larger” Dr. Lowery actually stated that he did not believe that the perforation became larger. Moreover, Miller argues, Dr. Lowery’s testimony did not establish that, even if the perforation was larger, it caused more problems for Bailey than she otherwise would have had. In short, Miller contends that, at best, the expert testimony from Dr. Colella and Dr. Lowery simply established that Bailey continued to have the same problems she had developed following the stomach-wrap surgery or that she experienced a general worsening of her condition that, Miller contends, is not compensable.
Miller’s arguments do not correlate with the inferences the jury could draw from the evidence presented at trial. First, Bailey presented substantial evidence through the testimony of Dr. Colella and Dr. Lowery that, if Dr. Miller sutured the perforation with inflamed tissue, he breached the standard of care. She also presented substantial evidence that the tissue Dr. Miller sutured was inflamed. It was undisputed that there was a lot of inflammation in the chest cavity when Dr. Miller performed the thoracotomy: the pleura (the chest cavity surrounding the lungs), the mediastinum (the portion of the chest cavity containing the heart), the chest wall, and the lungs were all inflamed. Indeed, the day before the October 1, 2000, surgery, a pint of fluid had been drained from Bailey’s chest. Because the medical records indicated the entire area was inflamed by gastric juices, Dr. Colella surmised that Dr. Miller sutured the stomach perforation together using inflamed tissue, and both he and Dr. Lowery testified that inflamed tissue would not hold together with sutures. Dr. Lowery also testified that, if healthy tissue had been used to support the sutures, “[y]ou would anticipate [the perforation] remaining closed.” The evidence indicated that Bailey’s condition improved for approximately a week following the October 1, 2000, surgery, but then it began to worsen and fluid once again started draining from her chest. Thus, the evidence supported Dr. Colella’s theory that Dr. Miller sutured inflamed tissue in closing the perforation, which held for a brief period but then gave way, resulting in new leakage from Bailey’s stomach to her chest cavity.
Dr. Colella testified that sutures placed in inflamed tissue will not hold, and Dr. Lowery confirmed that testimony. Dr. Colella further testified that the fact that the sutures would not hold “basically guarantee[d] ongoing trouble” for Bailey.
Following the October 1, 2000, thoraco-tomy, Bailey spent over two months in the hospital because additional stomach acid was leaking into her chest cavity and it constantly had to be drained from her body. Bailey testified that, as a result, she suffered from debilitating pain and a persistent cough during her treatment. In addition, Dr. Laws noted that Bailey suffered from bouts of nausea during the two occasions over her two months of treatment at Carraway that she was discharged, a condition that Dr. Laws eventually traced to her body having become addicted to the pain medication being administered during her hospital stays. Dr. Laws also discovered that a further problem had developed — a fístula between Bailey’s stomach and her right lung as a result of the damage being inflicted by the stomach fluid. The jury reasonably could have found that all of these conditions constituted injuries Bailey suffered as a direct result of Dr. Miller’s negligence in *867 the attempted repair of Bailey’s stomach perforation during the October 1, 2000, thoracotomy.
This Court has stated:
“[A] theory of causation is not mere conjecture, when it is deducible as a reasonable inference from ‘known facts or conditions,’ Alabama Power Co. v. Robinson, 447 So.2d 148, 153-54 (Ala.1983). ‘ “[I]f there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a judicial basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.” ’ Griffin Lumber Co. v. Harper, 247 Ala. 616, 621, 25 So.2d 505, 509 (1946) (quoting Southern Ry. v. Dickson, 211 Ala. 481, 486, 100 So. 665, 669 (1924)).”
Dixon v. Board of Water & Sewer Comm’rs of Mobile, 865 So.2d 1161, 1166 (Ala.2003). Dr. Colella’s theory of causation, which was supported by general statements from Dr. Lowery’s testimony, was deducible as a reasonable inference from the known facts and conditions of Bailey’s situation. Given that in reviewing Miller’s motion for a judgment as a matter of law we are to view the evidence in the light most favorable to Bailey and to entertain such reasonable inferences as the jury would have been free to draw, we conclude that the trial court did not err in finding that Bailey presented substantial evidence that Dr. Miller’s actions during the October 1, 2000, thoracotomy caused injuries to Bailey.

B. The Trial Court’s Judgment as a Matter of Law on Bailey’s Claim of Wantonness

Bailey contends that the trial court erred in dismissing her wantonness claim against Dr. Miller regarding his actions during the thoracotomy. Bailey contends that her wantonness claim should have been submitted to the jury because, she says, she presented evidence indicating that the tissue surrounding her stomach was inflamed, that Dr. Miller knew that sutures stitched into inflamed tissue would not hold, and that the failure of such sutures would result in a larger hole in her stomach. She also notes that Dr. Lowery testified that if Dr. Miller had sutured an inflamed area “that would be a gross breach of the standard of care,” and that Dr. Colella testified that no “board certified surgeon [could] have reasonably expected that these two sutures ... would hold” if the tissue was inflamed.
Wantonness, however, is “not merely a higher degree of negligence; instead, it is a ‘qualitatively different tort concept of actionable culpability.’ ” Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17, 19 (Ala.1996) (quoting Lynn Strickland Sales & Serv. Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987)).
“‘“Gross negligence” is negligence, not wantonness.
“ ‘Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, that with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury.’ ”
Smith v. Roland, 243 Ala. 400, 403, 10 So.2d 367, 369 (1942) (quoting 5 Mayfield’s Digest, p. 711, § 6). Our legislature has defined wanton conduct as “[cjonduct which is carried on with a reckless or conscious disregard for the rights or safety of others,” § 6 — 11—20(b)(3), Ala.Code 1975, and, to justify an award of punitive damages, must be proven by “clear and convincing evidence,” § 6-ll-20(a), Ala.Code 1975. See also § 6-U-20(b)(4), Ala.Code *868 1975 (defining “clear and convincing evidence”).
We cannot conclude that the record before us contains sufficient evidence from which a jury could conclude under the aforesaid statutes that Dr. Miller had engaged in conduct that was “carried on with a reckless or conscious disregard for the rights or safety” of Bailey. Thus, the trial court did not err in entering a judgment as a matter of law in favor of Miller on Bailey’s wantonness claim.[8]

IV. Conclusion

On the basis of the forgoing, the trial court’s judgment is due to be affirmed in all respects.
1071624 — AFFIRMED.
COBB, C.J., and LYONS, WOODALL, SMITH, BOLIN,* PARKER, and SHAW, JJ., concur.
STUART and MURDOCK, JJ., dissent.
1071665 — AFFIRMED.
COBB, C.J, and LYONS, WOODALL, STUART, SMITH, BOLIN,* PARKER, MURDOCK, and SHAW, JJ., concur.

.A Nissen fundoplication involves wrapping the fundus of the stomach around the esophagus in order to prevent the gastric juices from flowing up into the esophagus.

.- A thoracotomy is an exploratory surgery of the chest area.

. The mediastinum is the portion of the chest cavity containing the heart.

. A fistula is an abnormal tissue connection between one organ and another. In Bailey’s case, a connection had formed between her stomach and her right lung.

. On March 30, 2004, the trial court dismissed Dr. Foster as a defendant with prejudice pursuant to a stipulation by all the parties.

. In Lloyd Noland Hospital v. Durham, 906 So.2d 157 (Ala.2005), this Court declared § 6-5-543(b), the future-damages provision of the Alabama Medical Liability Act, to be unconstitutional because it violated Art. I, § 11, Ala. Const. 1901, which protects the right to trial by jury.

. As this Court has repeatedly stated, "substantial evidence” is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).

. Miller also contends that the trial court erred in refusing to submit a verdict form to the jury in compliance with § 6-5-543, Ala. Code 1975, otherwise known as the future-damages provision of the Alabama Medical Liability Act. The trial court declined to do so because, as we mentioned in note 6 supra, this Court declared § 6-5-543 to be unconstitutional in Lloyd Noland Hospital v. Durham, 906 So.2d 157 (Ala.2005). Miller invites us to revisit our holding in Durham to this effect and our holding to the same effect in Clark v. Container Corp. of America, Inc., 589 So.2d 184 (Ala.1991), upon which Durham relied, an invitation we decline.