Application of the Cranman Rule
The main opinion in Ex parte Cranman, 792 So.2d 392,404-05 (Ala. 2000), states as follows:
 "We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. The time has come to face the necessity of defining `injury,' as that word is used in § 13[, Ala. Const. 1901], in lawsuits against State employees alleging torts committed in the line of duty, in a manner that neither violates § 13 nor prefers § 14[, Ala. Const. 1901,] or § 6.01 of the Judicial Article over § 13. We decline to label all discretionary acts by an agent of the State, or all acts by such an agent involving skill or judgment, as `immune' simply because the State has empowered the agent to act. Such an expansive view of the power of the State to act with immunity for its agents would be inconsistent with the rights secured by § 13.
 "We therefore restate the rule governing State-agent immunity:
 "A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
 "(1) formulating plans, policies, or designs;
 "(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as
 "(a) making administrative adjudications;
 "(b) allocating resources;
 "(c) negotiating contracts;
 "(d) hiring, firing, transferring, assigning, or supervising personnel; . . . "(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; . . .
 "(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; [and]
 "(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students."
(Citations omitted.) In Ex parte Butts, 775 So.2d 173
(Ala. 2000), a majority of the Court adopted Cranman's
statement of the State-agent-immunity test.
Under the rule of State-agent immunity as formulated inCranman and adopted in Butts, Hattie Randall was entitled to a summary judgment only if she demonstrated *Page 670 
to the trial court that her conduct fell within one of the above-quoted five categories. The main opinion criticizes this dissent for "appearing] to treat as exhaustive the listillustrating the basis of immunity in Cranman."971 So.2d at 664 (emphasis added). Given the language and structure of the rule of immunity expressed inCranman, I am uncertain what is meant by the suggestion that "the list" in Cranman is not "exhaustive." Admittedly, categories (2) and (4) each describe conduct of a certain nature and then give their own nonexhaustive "list" of examples. These examples, however, are only examples of conduct that falls within those respective categories. The other three categories contain no such list of examples. My point, however, is that to fall within one of the five categories, a defendant's conduct must meet the description provided by that category, and it is clear from the language and structure used in Cranman that the five categories articulated constitute the entirety of the immunity rule. See also Butts, supra; note 17 and accompanying text, infra. If this Court is of the opinion that there is or should be some additional catchall category for the discretionary execution of governmental policy generally, it is incumbent upon us to so state and to express the parameters of that category.
Although Randall quotes the Cranman test in its entirety in her brief to this Court, Randall does not expressly identify the particular category into which she contends her conduct falls. She does not argue that she was "formulating plans, policies, or designs" (category (1)); that she was "exercising . . . her judgment in the administration of a department or agency of government" (category (2)); that she was "exercising judgment in the enforcement of the criminal laws" (category (4)); or that she was "exercising judgment" in "releasing prisoners, counseling or releasing persons of unsound mind, or educating students" (category (5)). Presumably Randall makes no argument that her conduct falls within one of these categories for the simple reason that the plain language of these categories does not allow for any such argument. Randall was not making policy as contemplated by category (1). Unlike category (1), categories (2), (4), and (5) contemplate the exercise of judgment or discretion in the execution of certain laws or policies specifically identified in those categories or the administration of a department or agency. Although Randall arguably was indeed "exercising judgment" and discretion in the execution of governmental policy, she simply was not exercising judgment as to any of those threeCranman categories, i.e., categories (2), (4), and (5).[9] *Page 671 
Unable to fit her conduct in any other Cranman
category, and without specifically referring to category (3), Randall would apparently have this Court treat her conduct as falling into that category, i.e., as the performance of duties in a manner that is prescribed by statute, rule, or regulation. Randall states in her petition to this Court that she "has presented evidence of compliance with agency policies" (petition at 11) and that she "established by her affidavit and by attached documentation that her actions were in accord with DHR [Department of Human Resources] policy and state law." (Petition at 12.) According to Randall, "[t]he [Hernandezes] have presented no evidence, much less substantial evidence, that Randall failed to complete the form according to DHR policy or failed to write down a code required by DHR policy." (Petition at 17.) She also argues that, "[a]t all times," she "acted within DHR policy as stated by her supervisors, DHR written policy, and DHR legal counsel." (Petition at 18.)[10]
Randall was entitled to a summary judgment based on the third category of Cranman, however, only if she showed the trial court (1) that she was performing duties "imposed on" the Department of Human Resources ("the Department") by a "statute, rule, or regulation"; (2) that the "statute, rule, or regulation prescribe[d] the manner for performing the duties"; and (3) that there was no issue of material fact as to whether she performed the prescribed duties in the prescribed manner. The trial court decided that Randall had not
made the required showing. Randall is entitled to the issuance by this Court of an extraordinary writ in the nature of mandamus only if she has demonstrated to us a "clear legal right to relief from that decision, Ex parte Children'sHosp. of Alabama, 931 So.2d 1, 8 (Ala. 2005), or, in other words, that there is "`"no reasonable basis for controversy about the right to [such] relief."`" Ex parte Vance,900 So.2d 394, 399 (Ala. 2004) (quoting other cases). I conclude that she has not done so.
The statutes and regulations governing the renewal of a license to operate a "Family Day Care" impose upon the Department a duty to inspect and investigate day-care facilities to assess whether those facilities meet certain minimum standards.See Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.03(4), -.03(9)(d), and -.03(10); see also
Ala. Code 1975, §§ 38-7-6(b) and 38-7-11. After reviewing the materials before this Court and the pertinent state statutes and day-care-licensing regulations issued by the Department,see generally Ala. Code 1975, § 38-7-1 et seq. and Ala. Admin. Code (Department of Human Resources), r.660-5-27-.01 et seq., I cannot conclude that the "statutes, rules, and regulations" governing the Department's day-care-licensing program fully "prescribed themanner" in which Randall was required to perform her investigation of Poplin's facility. Instead, Randall was left with significant discretion in how to conduct her investigation.[11] See Phillips v. Thomas, *Page 672 555 So.2d 81, 86 (Ala. 1989) (recognizing that under the above-described statutes, the investigation of a day-care facility by a social worker employed by the Department entails both discretionary and ministerial components).
Section 38-7-4, Ala. Code 1975, provides, in part:
 "Application for such license or approval to operate a child-care facility shall be made to the department in the manner and on forms prescribed by it. The department, upon receiving such application, shall examine the premises of the child-care facility, including buildings, equipment, furnishings and appliances thereof and shall investigate the persons responsible for the care of children therein. If, upon such examination of the facility and investigation of the persons responsible for care of children, the department is satisfied that the facility and the responsible persons reasonably meet standards prescribed for the type of child-care facility for which application is made, the department shall issue a license or an approval in the proper form, designating on said license or approval the type of child-care facility and, except for a child-placing agency, the number of children to be served at any one time."
(Emphasis added.) As to a license-renewal reexamination, the licensing statute provides:
 "The department shall reexamine every child-care facility for renewal of license or approval, including in that process, but not limited to, the examination of the premises and records of the facility and the persons responsible for the care of children as the department considers necessary to determine that minimum standards for licensing or approval continue to be met. . . . If the department or the licensed child-placing agency, as the case may be, is satisfied that the facility continues to meet and maintain minimum standards which the department prescribes and publishes, the department shall renew the license or approval to operate the facility or the licensed child-placing agency shall renew its approval of a boarding home."
Ala. Code 1975, § 38-7-6(b) (emphasis added). Section 38-7-11 provides that the Department's inspection
 "shall include, but not be limited to, premises, services, personnel, program, accounts and records, interviews with agents and employees of the child-care facility being inspected and interviews with any child or other person within the custody or control of said ckild-care facility. Such inspection shall be made at any reasonable time, without prior notice, and as often as necessary to enforce and administer the provisions of this chapter If any such inspection . . . discloses any condition, deficiency, dereliction or abuse which is, or could be, hazardous to the health, the safety or the physical, moral or mental well-being of the children in the care of the child-care facility being inspected, the same shall at once be brought to the attention of the department. . . ."
The regulations add that
 "[i]f an inspection, evaluation, or investigation indicates non-compliance with the minimum standards (deficiency), a deficiency report shall be prepared by the Department. . . . In any visit to the home in which deficiencies are observed or noted, the licensing representative shall complete a deficiency report, and discuss the deficiencies observed or noted *Page 673 
with the licensee or facility representative."
Ala. Admin. Code (Department of Human Resources), r.660-5-27-.11(3).[12]
In general, these statutes and regulations left Randall with significant discretion as to the manner in which she was to examine and investigate the day care and then formulate and record her findings and recommendations. First and foremost, the above-quoted statutes and regulations did not limit Randall's responsibilities merely to the completion of the questionnaire at issue.[13]
Even if we focus solely upon the issue of the questionnaire, and even if the general act of completing that questionnaire was ministerial in the sense that Randall had no discretion but to complete it, nothing in the statutes and regulations required Randall merely to pose certain questions to Poplin about her compliance with day-care-facility requirements and then un-questioningly record and report Poplin's responses. Randall had discretion as to whether to accept at face value what Poplin told her or, if she had reason to question its credibility, to pursue such further examination as Randall, in her discretion, might deem warranted. Nor did the rules and regulations limit Randall in what other information she could elicit, or should view as reliable, in completing her investigation generally, or in completing specific forms. The statutes and regulations did not dictate to Randall under what circumstances she should or should not extend her investigation, based on either her observation of conditions at the facility or other information she might, in her discretion, elicit from the operator of the day-care facility, its other employees, or its clients.
Furthermore, the statutes and regulations do not prescribe exactly how Randall should complete the aforesaid investigative forms. In fact, the form titled "Child Care Home Licensing Evaluation" contains eight pages of boxes to be checked, prefaced by the heading "Sections to be completed at thediscretion of the [Department] Licensing Representative." (Emphasis added.) Randall herself testified by affidavit that certain "codes" on the form were interchangeable and that the use of those codes was left to her discretion.[14] *Page 674 
In Phillips, this Court made clear that the duty of an employee of the Department to investigate a day-care facility partakes of both discretionary and nondiscretionary activities. That case involved the assertion of State-agent immunity by Pittman, the director of the Department's Family and Children's Services Division, and Thomas, a State employee assigned to the Office of Daycare, presumably within that division. With respect to a claim against Pittman for negligently training and supervising Thomas, this Court had "little difficulty concluding that the exercise of such function is, for themost part, discretionary in nature" and, "to thatextent, afford[ed] Pittman substantive immunity" under the pre-Cran-man "discretionary public function" formulation of the immunity rule. 555 So.2d at 85 (emphasis added) (recognizing that Pittman's duty, in some respects, "required constant decision making and judgment" but, "[a]t the same time," included functions that could "be composed of ministerial acts").
Moreover, the opinion in Phillips then proceeds to analyze the statutes at issue here and to discuss Thomas's claims of immunity for her direct role in inspecting a day-care facility. The opinion first quotes Ala. Code 1975, § 38-7-4, which I have quoted above. Phillips then states:
"As concerns the inspection of day care facilities, § 38-7-11 provides, in part, as follows:
 "`. . . Such inspection shall include, but not be limited to, premises, services, personnel, program, accounts and records, interviews with agents and employees of the child-care facility being inspected and interviews with any child or other person within the custody or control of said child-care facility. Such inspection shall be made at any reasonable time, without prior notice, and as often as necessary to enforce and administer the provisions of this chapter. . . . If any such inspection of a licensed or approved child-care facility discloses any condition, deficiency, dereliction or abuse which is, or could be, hazardous to the health, the safety or the physical, moral or mental well-being of the children in the care of the child-care facility being inspected, the same shall at once be brought to the attention of the department, and the department shall have the power to revoke without notice the license or approval or six-month permit of such child-care facility.' (Emphasis added.)
 "Again, we recognize that these duties, although affirmative in nature, do require a considerable degree of discretion within department guidelines. Cf, Grant [v. Davis], 537 So.2d 7, 10 (Ala. 1988). Again, we also recognize that they can be composed of ministerial components."
555 So.2d at 85-86 (final emphasis added) (ultimately concluding that Thomas could be personally liable for negligently per *Page 675 
forming the "ministerial act" of completing the questionnaire in that case when she wrongly reported that the pool at the facility was enclosed by a fence).[15]
Poplin was required to maintain the following documents for each child currently enrolled in her day care and for each child who had been enrolled in the day care during the preceding two years: (a) preadmission forms, (b) immunization certificates, and (c) medication-authorization forms.See Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.07(9)(g) and -.07(9)(h). According to the evaluation forms completed by Randall as to the 12 children who were enrolled in Poplin's day care when Randall investigated the facility, however, Poplin did not possess preadmission forms for any of those 12 children. Further, Poplin was not in possession of the required immunization certificates for 10 of those 12 children. Notwithstanding this record of noncompliance, Randall exercised her discretion and chose to accept at face value Poplin's explanation for the absence of any medication-authorization forms, namely, that Poplin had not administered any medication to any of the children then in her care. Based on Randall's acceptance of this representation at face value, she proceeded to report to the Department that the requirement for maintenance of medication-authorization forms was "not applicable" to Poplin. Given the undisputed evidence of Poplin's failure to comply with the Department's record-keeping requirements as to preadmission forms and immunization certificates, however, Randall could have exercised her discretion so as to not accept Poplin's explanation for the absence of medication-authorization forms but to instead conduct further inquiries and/or to note concerns in her report.
Further, Randall admitted that she did not review the records of children who had been in Poplin's day-care facility during the two years before her visit, but who were not enrolled in the day care at the time Randall performed her investigation. As to this deficiency, Randall cannot have it both ways. If the duty to examine the "records of the facility" under § 38-7-6, as part of the overall investigative effort, was a particular task prescribed by statute, then Randall's failure to perform it would not be protected by category (3) immunity. On the other hand, if Randall's discretion in investigating the facility extended to the decision whether to review those records, *Page 676 
category (3) immunity would not protect Randall if, in light of Poplin's failure to comply with other record-keeping requirements, Randall were found negligent for failing to review them.[16]
Based on the foregoing, I cannot conclude that Randall has made a showing of a "clear right to relief — one as to which there is "no reasonable basis for controversy." In my view, her responsibilities were fundamentally discretionary in nature and therefore were not protected under the plain language of the third Cranman category. Under pre-Cranman
precedents, discretion was the very characteristic that led to protection for the employee's conduct under the "discretionary public function" formulation of the immunity rule. ComparePhillips, supra; Grant v. Davis, 537 So.2d 7 (Ala. 1988);see also Restatement (Second) of Torts § 895D (1979) (providing, in pertinent part, that "[a] public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if (a) he is immune because he engaged in the exercise of a discretionary function"). Under the Cranman
formulation of the immunity rule, it is that same characteristic — discretion — that removes an employee's conduct from the only Cranman category at issue here, category (3).
Despite the difficulty of "squeezing" Randall's conduct into category (3) as articulated in Cranman, the main opinion and Justice See's special concurrence take comfort in the suggestions (1) that pre-Cranman decisional law would support the result reached here and (2) thatCranman was merely a "restatement" of that law. I agree with the former suggestion; I disagree with the latter. In point of fact, if this case were to be decided under the "discretionary public function" analysis utilized inpre-Cranman cases, the result would indeed be a finding of immunity. See Phillips, supra. If we remove from the calculus the dispute over whether the conduct at issue is fundamentally discretionary in nature or fundamentally ministerial, and we assume for the sake of discussion a hypothetical set of facts in which the Department and its employee are merely given the responsibility to investigate a day-care facility in whatever manner they, in their discretion, deem appropriate, the pre-Cranman
discretionary-public-function analysis clearly would
extend immunity to such conduct. See Phillips, supra;Grant, supra. For the reasons discussed above, however, category (3) in the Cranman "restatement" clearlywould not provide immunity under such facts. Nor does any other Cranman category. Moreover, the fact that the reformulation of the immunity rule in Cranman was actually intended to alter preexisting decisional law was expressed in Cranman itself. After engaging in a thorough discussion of preexisting caselaw, the main opinion inCranman explained its reformulation of the rule by stating as follows:
 "We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw *Page 677 characterizing as a discretionary Junction conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution. Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 42 (Ala. 1998) (Lyons, J., concurring specially) (citing Gwin, White Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting)). The time has come to face the necessity of defining `injury,' as that word is used in § 13[, Ala. Const. 1901], in lawsuits against State employees alleging torts committed in the line of duty, in a manner that neither violates § 13 nor prefers § 14[, Ala. Const. 1901,] or § 6.01 of the Judicial Article over § 13. We decline to label all discretionary acts by an agent of the State, or all acts by such an agent involving skill or judgment, as `immune' simply because the State has empowered the agent to act. Such an expansive view of the power of the State to act with immunity for its agents would be inconsistent with the rights secured by § 13."
792 So.2d at 404-05 (emphasis added).
Based on the foregoing, I cannot conclude that Randall's petition for a writ of mandamus is due to be granted insofar as that petition is based upon her claim of State-agent immunity.
 The Public-Duty Rule
In addition to her claim to State-agent immunity, however, Randall argues in her brief to this Court that, as a social worker engaged in licensing day-care facilities, she had no legal duty to the plaintiffs. Relying upon AlabamaDepartment of Corrections v. Thompson, 855 So.2d 1016
(Ala. 2003), Randall argues that "[a]ny duty she owed was to the public at large and, therefore, insufficient to support a claim for negligence."[17] *Page 678 
Even if there is merit to Randall's public-duty-rule argument, this case is before us on a petition for a writ of mandamus. As the main opinion notes, the general rule is that the denial of a motion for a summary judgment is not reviewable by a petition for writ of mandamus, but this Court has recognized an exception when the motion is grounded on a claim of immunity.971 So.2d at 661 (quoting Ex parte Turner,840 So.2d 132, 135 (Ala. 2002)). Randall does not invoke the public-duty rule to urge upon us some reformulation or other revision in the rule of immunity articulated in Cranman.[18]
Instead, Randall invokes the public-duty rule merely for the purpose of arguing that the plaintiffs cannot demonstrate one of the elements of their negligence claim, i.e., that Randall owed the plaintiffs a duty. See, e.g., Martin v.Arnold, 643 So.2d 564, 567 (Ala. 1994). Accordingly, I do not believe Randall's public-duty-rule argument provides an appropriate basis for granting her petition for a writ of mandamus. See, e.g., Ex parte Haralson, 853 So.2d 928,931 n. 2 (Ala. 2003) (noting that, when a petition for a writ of mandamus is based on a claim of immunity, this Court does not address a petitioner's additional grounds for issuance of the writ that are not related to the immunity claim when the petitioner has an adequate remedy by way of appeal to assert those additional grounds).
 The Issue of Wantonness
In addition to the analysis by which the main opinion concludes that Randall's conduct falls within one of the categories of immunized conduct prescribed in Cranman, the main opinion goes the further step of discussing one of the two exceptions to immunity also articulated in Cranman,see 792 So.2d at 405. Specifically, the `main opinion concludes that Randall's conduct would not fall within the exception stated for acts committed "willfully, maliciously, fraudulently, in bad faith, beyond [the State agent's] authority, or under a mistaken interpretation of the law."Id. This is so, according to the main opinion, because Randall's conduct is "consistent only with negligent Or wanton behavior." 971 So.2d at 664. The main opinion refers to wanton behavior as "an aggravated form of negligence" and cites this Court's 2003 decision in Giambrone v. Douglas,874 So.2d 1046 (Ala. 2G03), for the proposition that such behavior does not deprive a State agent of immunity.
Neither the parents' complaint nor their briefs to this Court assert wantonness as a ground for their wrongful-death claim. Nor has Randall discussed the issue of wantonness. Moreover, given the definition of wantonness, see discussioninfra, it is not apparent that Randall's acts rise to that level. Nonetheless, because the main opinion addresses the issue, I likewise will comment on it.
According to Sellers v. Thompson, 452 So.2d 460, 462
n. 3 (Ala. 1984),
 "[i]n Deal v. Tannehill Furnace Foundry Comm'n, 443 So.2d 1213 (Ala. 1983), we expanded the scope of discretionary function immunity to include allegations of wantonness on the part of State officials sued in their individual capacities where . . . there was no evidence of bad faith on the part of the officials."
(Emphasis added.) Neither Deal v. Tannehill Furnace Foundry Comm'n, *Page 679 443 So.2d 1213 (Ala. 1983), nor Sellers, however, discusses by what authority this Court was compelled, or should have been persuaded, to expand the scope of discretionary-function immunity so as to exclude wantonness claims. Moreover, on its facts Deal appears to involve only negligence on the part of the individual defendants. There is no suggestion in the facts that those defendants acted wantonly, as that term has come to be understood, i.e., involving acts committed willfully with a conscious realization that injury likely or probably will result. See
discussion infra. Furthermore, the context in whichDeal uses the terms "wantonness" and "good faith,"see 443 So.2d at 1215 and 1218, and Sellers
uses the term "bad faith," see 452 So.2d at 462 n. 3, suggest that those cases were attempting merely to distinguish between acts of mere inadvertence, or negligence, on the one hand, and acts committed in bad faith in the sense of a conscious disregard for the safety of others. CompareStiebitz v. Mahoney, 144 Conn. 443, 448, 134 A.2d 71, 74
(1957) (noting that "the law clothed [the State agent] with immunity from liability for his official acts, performed in the use of a delegated discretion, as long as they were done'in good faith, in the exercise of an honest judgment,and not in abuse of . . . discretion, or maliciously or wantonly.' Wadsworth v. Town of Middletown,94 Conn. 435, 439, 109 A. 246, 248 [(1920)]." (emphasis added)).
This Court has recognized that wantonness is qualitatively different from, and is more than an aggravated form of, negligence. Lynn Strickland Sales Serv., Inc. v.Aero-Lane Fabricators, Inc., 510 So.2d 142, 145-46
(Ala. 1987). "`Wantonness' has been defined by this Court as theconscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act,injury will likely or probably result." Alfa Mut. Ins. Co.v. Roush, 723 So.2d 1250, 1256 (Ala. 1998) (emphasis added); see also Ala. Code 1975, § 6-11-20
(defining wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others" (emphasis added)). Given this definition, I question whether wanton conduct is, and should be treated for immunity purposes as, more akin to acts committed "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law," than to mere negligence. This Court itself has grouped wantonness with both willfulness and recklessness. Indeed, given a proper understanding of the concept of willfulness and its relation to the meaning of wantonness, it may be that the Cranman
exception for "willful" actions should be construed as including "wanton" conduct.[19] In Lynn Strickland, this Court explained:
 "Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury. . . . As the Court stated in Smith v. Roland, 243 Ala. 400, 403, 10 So.2d 367, 369 (1942), quoting 5 Mayfield's Digest, p. 711, § 6: *Page 680 
"`"Gross negligence" is negligence, not wantonness. Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, [and] that with reckless
indifference to consequences, he consciously
and intentionally did some wrongful act or omitted some known duty which produced the injury.'
"Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentionalact."
510 So.2d at 145 (emphasis added). Black's LawDictionary (5th ed. 1979), cited with approval in LynnStrickland, explained that "`[negligence] is characterized chiefly by inadvertence, thoughtlessness, inattention and the like, while "wantonness" or "recklessness" is characterized by willfulness.'" 510 So.2d at 146.[20]
It may be considered ironic that we would judicially immunize wanton conduct by State officials while our legislature has reaffirmed that wantonness is the very type of conduct for which our civil law reserves the potentially heavy sanction of punitive damages. See Ala. Code 1975, § 6-11-20. Moreover, in so doing, the legislature grouped wanton conduct with, and considered it as meriting the same treatment as, acts committed "maliciously" and "fraudulently." Id., Further, in several contexts our legislature has specifically refused to extend qualified immunity as a defense to claims alleging wanton conduct. See Ala. Code 1975, § 6-5-663 (volunteer medical professionals); Ala. Code 1975, § 10-11-3 (noncompensated officers of nonprofit corporations); Ala. Code 1975, § 11-89C-8(d) (individuals acting on behalf of certain public corporations); Ala. Code 1975, § 25-4-113
(certain persons associated with the Department of Industrial Relations).
In short, I have serious doubts about whether, in order to protect executive discretion, it is necessary to protect the conduct of State officials who, with knowledge that injury or death likely or probably will result from their actions, act with a conscious disregard for the safety of others.Compare, e.g., Stiebitz, supra; Gilbert v. Richardson,264 Ga. 744, 752, 452 S.E.2d 476, 482 (1994) ("The doctrine of official immunity, developed primarily in Georgia through case law, provides that while a public officer or employee may be personally *Page 681 
liable for his negligent ministerial acts, he may not be held liable for his discretionary acts unless such acts arewillful, wanton, or outside the scope of hisauthority." (emphasis added)); Neal v. Donahue,611 P.2d 1125, 1129 (Okla. 1980) ("Although officers and employees of governmental agencies, including the State, are protected from tort liability while performing discretionary functions, such protection does not render such employees immune from liability for willful and wantonnegligence." (footnotes omitted; emphasis added));Bryant v. Duval County Hosp. Auth., 459 So.2d 1154
(Fla.Dist.Ct.App. 1984) (construing a Florida statute as not immunizing actions performed in bad faith, with malice, or with willful and wanton disregard for the safety of others);Conley v. Shearer, 64 Ohio St.3d 284, 288,595 N.E.2d 862, 866 (1992) (to like effect).
 Conclusion
Based on the foregoing, I conclude that Randall has not demonstrated a clear legal right to a reversal of the trial court's decision denying her motion for a summary judgment. I therefore respectfully dissent.
COBB, C.J., concurs.
[9] As the petitioner in this mandamus proceeding, Randall has the burden to demonstrate to this Court a clear legal right to relief. See Ex parte Children's Hosp. of Alabama,931 So.2d 1, 8 (Ala. 2005). As discussed in the text,infra, the only Cranman category that her briefs to this Court suggest is applicable in this case is category (3). The main opinion, however, makes note of the fact that category (2) of Cranman "refers to a State agent's `exercising his or her judgment in the administration of a department or agency of government,including, but not limited to, examples such as' and there follow certain specific activities." 971 So.2d at 662
(quoting Cranman, 792 So.2d at 405 (emphasis in main opinion)). I do not see how the fact that category (2) includes a nonexhaustive list of examples of conduct that fall withinthat category supports the conclusion in the main opinion "Randall cannot be faulted for her failure to identify in her petition an illustration that applies neatly to her situation." 971 So.2d at 664. Category (2), which involves theadministration of a department or agency, simply is not applicable in this case. Randall, as the petitioner, makes no effort to meet her burden by reference to category (2), and, in any event, the wording of that category would not support such an effort.
[10] In this regard, Randall's position appears inconsistent with that of the social worker for the Department of Human Resources in Ex parte Trawick, 959 So.2d 51
(Ala. 2006). In Trawick, this Court, among other things, up-held a trial court's order denying a motion for a summary judgment filed by a social worker for the Department who allegedly failed to properly investigate a day-care facility on the ground that "at no point [did the social worker] actually argue that she was required by law to engage in or to refrain from certain actions." 959 So.2d at 56.
[11] Given the specific language used for category (3) immunity (including the absence of any qualifying "exercising judgment" language found in categories (2), (4), and (5)), category (3) does not apply to the exercise of discretion in deciding how to perform a duty.
[12] The regulations also contain a detailed description of the minimum standards the day-care facility must meet.See Ala. Admin. Code (Department of Human Resources), r. 660-5-27-.04 through -.10 and r. 660-5-27-.13 through -.14.
I also note that, accepting for present purposes that the "Minimum Standards" manual that was provided to Randall by the Department and that Randall submitted with her petition contains "rules" of the nature contemplated by category (3), I see nothing in the manual that materially alters my view of the degree of discretion held by Randall in performing her investigative duties.
[13] In his special concurrence, Justice See refers to "Randall's conduct in completing the licensing-evaluation forms issued by the Mobile County Department of Human Resources."971 So.2d at 666. The basis for my opinion in this case, however, is that Randall as a fundamental matter had responsibility for much more than merely the completion of a checklist or an evaluation form.
[14] Justice See states that "we must be careful when considering acts that are either ministerial or discretionary in their fundamental nature that we do not so finely reduce them into ministerial and discretionary components that we effectively abolish State-agent immunity," 971 So.2d at 667, a sentiment with which I agree. Justice See then states, however, that we should be careful not to "disaggregate and inspect, piece by piece" every task in such a way as to "require the State actor to defend each component action that does not partake of the discretionary — or, as here, theministerial — nature-of the Cranman
category under which the general act is immunized."971 So.2d at 667. The emphasized passage reflects an earlier suggestion in Justice See's writing that Randall's conduct involved merely the completion of evaluation forms. See note 13,supra. It presumes that the "fundamental nature" of Randall's activity "here" is "ministerial," and that we ought to be careful not to inspect piece by piece those portions of it which do "not partake of the . . . ministerial." My point, however, is that the "fundamental nature" of the responsibility with which the Department and Randall were charged — the investigation and licensing of the day-care facility — isnot ministerial, as it would have to be to fall withinCranrnan's category (3). Rather, this responsibility is "discretionary in its fundamental nature." As discussed, it involves much more than just the mechanical "complet[ion] of the licensing-evaluation forms." Even the completion of the evaluation forms, upon close examination, is seen to involve significant discretion.
[15] Although it too is a pre-Cranman case,Grant v. Davis, 537 So.2d 7 (Ala. 1988), cited inPhillips, also is instructive. While in one aspectGrant addressed a function that "substantially part[ook] of planning level activities," 537 So.2d at 9, on a separate note the opinion addressed the duty of workers employed by the Alabama Department of Transportation ("ADOT") simply to inspect roadways for defects. Although manuals provided by ADOT required workers to make frequent inspections, the Court noted:
 "The duty to inspect the roads is an affirmative duty but one that also involves a type of discretion giving rise to qualified immunity. In performing that function, the defendants are involved in determining the manner of carrying out these inspections, i.e., determining the method and means. Thus, they are carrying out the directives of the guidelines that they must follow by determining how the inspections are to be carried out.
While the defendants have no discretion not to inspect, they do have the discretion to determine the practical method for inspecting each road."
537 So.2d at 10 (some emphasis original; some emphasis added). Although the State agent in Grant was performing a specific duty that was prescribed to him by law, the facts that he had significant discretion in how to perform that duty and that his alleged wrong-doing arose from the exercise of that discretion entitled him to immunity under the pre-Cranman formulation of discretionary public-function immunity.
[16] Even if we could construe the statutes and regulations at issue as prescribing to Randall the manner in which she was to perform all aspects of her investigation and the recording of information regarding the day care she was inspecting, it still could not reasonably be suggested that those statutes and regulations were intended to require Randall unquestioningly to accept and rely upon representations of the operator of a day-care facility that could not reasonably be considered credible. Compare Ex parte Trawick, 959 So,2d 51, 60
(Ala. 2006) (See, J., joined by Smith, J., concurring in the rationale in part and concurring in the result) ("[The defendant social worker] cites no statute, rule, or regulation that put her under an obligation to misrepresent facts to [the plaintiff-parent] . . . ."); see also Phillips,supra.
[17] In Thompson, a prison warden and two correctional officers were sued for allowing the escape of an inmate who then broke into the plaintiff's home, assaulted her, and stole her automobile; the plaintiff sought compensatory and punitive damages. Although these individual defendants did not fall within any of the five categories of protected conduct articulated in Cranman and therefore were not entitled to a summary judgment on the ground of State-agent immunity, the defendants also argued to the trial court that they owed no duty to the plaintiff to protect her from the criminal acts of a third person. This Court agreed, holding that "state correctional officers owe a general duty to the public, not a duty to a specific person, to maintain custody of inmates."855 So.2d at 1025. In so holding, this Court quoted with approval from the Michigan Court of Appeals' decision in Chivas v.Koehler, 182 Mich.App. 467, 453 N.W.2d 264 (1990), in which, among other things, the Michigan court explained that
 "`generally a police officer does not owe a duty to any one individual. A police officer's duty is generally owed to the public and not to a specific individual. . . . Only where a special relationship between the parties exists which the law recognizes and defines as including a duty to conform to a particular standard of conduct toward another will a duty be recognized.'"
855 So.2d at 1023 (emphasis omitted).
The Thompson Court also found persuasive a decision of the South Carolina Court of Appeals referenced by Randall in her petition, Washington v. Lexington County Jail, 337 S.C. 400, 405-06, 523 S.E.2d 204, 206-07 (S.C.Ct.App. 1999), in which the South Carolina court explained
 "`Under the public duty rule, public officials are generally not held liable to individuals for negligence in discharging public duties because the duty is owed to the public at large and not to any one individual. "The public duty rule is a negative defense which denies an element of the plaintiff's cause of action — the existence of a duty to the individual plaintiff. . . ."
 ". . . .
"`An exception to the public duty rule, however, is recognized when a plaintiff can establish that the defendant owed him an individual or special duty of care.'"
855 So.2d at 1024 (citations and emphasis omitted).
[18] It may well be that the "public-duty rule" would ultimately provide protection from liability in many of the same cases as would the pre-Cranman
"discretionary-public-function" test. Neither that question nor the proposition that we somehow should utilize the public-duty rule as a basis for reformulating or revising the rule of immunity is before us, however.
[19] This conclusion arguably is bolstered by the use of the term "willfully" in a list that includes acts done "maliciously, fraudulently, in bad faith, beyond authority, and under mistaken interpretations of law."792 So.2d at 405. Cf. Ex parte Emerald Mountain ExpresswayBridge, L.L.C., 856 So.2d 834 (Ala. 2003) (discussing the principles of context, noscitur a sociis, andejusdem generis in relation to statutory construction).
[20] In Lynn Strickland, 510 So.2d at 146, this Court discussed other primary and secondary authorities explaining the concept of wantonness in a way that implicates willful conduct, including: Thompson v.White, 274 Ala. 413, 420, 149 So.2d 797, 804 (1963) ("'[W]anton or willful misconduct implies mental action; whereas that fact is absent in mere negligence.'" (emphasis added)); Coleman v. Hamilton Storage Co.,235 Ala. 553, 559, 180 So. 553, 559 (1938) ("`The fact that defendant's servant was not guilty of negligence would not preclude a finding by the jury that he was guilty ofwillful or wanton conduct.'" (emphasis in LynnStrickland omitted and emphasis added)); Prosser Keeton on Torts 212 (5th ed. 1984) ("`["Willful," "wanton," and reckless" misconduct] have been grouped together as an aggravated form of negligence, differing in qualityrather than in degree from ordinary lack of care.'" (emphasis added in Lynn Strickland)); Speiser, Krause, and Gans, 3 The American Law of Torts, § 10.1 at 358 (1986) ("`While such a tort [wanton misconduct] has been labeled "willful negligence," "wanton and willful negligence," "wanton and willful misconduct," and even "gross negligence," it is most accurately designated as "wanton and reckless misconduct." As the Wyoming court puts it: While "ordinary" and "gross" negligence differ in degree "ordinary" negligence and "willful and wanton" misconduct differ inkind.'").